UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES, EX REL. DR. SUSAN NEDZA, | ) | | |
| | ) | | |
| Plaintiff-Relator, | ) | No. | 15-CV-6937 |
| | ) | | |
| v. | ) | JUDGE JORGE L. ALONSO | |
| | ) | | |
| AMERICAN IMAGING MANAGEMENT, INC., *et al.*, | ) | | |
| | ) | | |
| Defendants. | ) | | |
| | ) | | |

**RELATOR'S OMNIBUS RESPONSE IN OPPOSITION
<u>TO DEFENDANTS' MOTIONS TO DISMISS</u>**

**TABLE OF CONTENTS**

I.    Introduction ........................................................................................................ 1

II.    The SAC more than adequately pleads Defendants' intentional scheme to defraud the federal government. ........................................................................................ 4

    A.    The SAC explains that Defendant MA Plans hire AIM to generate profits at the expense of patients. ............................................................................................ 5

    B.    The SAC describes how the submission of false claims flowed directly from Defendants' fraud scheme. .................................................................................. 10

III.    Relator alleges a plausible intentional fraud scheme with sufficient particularity to meet Rules 8 and 9(b). ............................................................................................... 12

    A.    There is no formula for pleading fraud; Rule 9(b) only requires sufficient particularity to ensure notice to defendants and that there is "some basis" for the complaint ................................................................................................................ 12

    B.    Relator supplies the factual basis required by Rule 9(b). ..................................... 13

    C.    Relator provides sufficient notice to each Defendant of its role in the fraud. ...... 14

        1.    Group pleading is appropriate where multiple defendants engaged in the same conduct. ................................................................................................. 16

    D.    The Seventh Circuit does not require transaction level details where, as here, the government is indisputably the major payor, making the fact that Defendants submitted claims for government payment a foregone conclusion. ..................... 18

        1.    Defendants undeniably submitted false claims for payment. ................... 18

        2.    Defendant MA Plans contracted with AIM and necessarily signed CMS contracts as participants in the Medicare Advantage program. ................ 23

IV.    Relator pleads each element of an actionable False Claims Act violation. ...................... 24

    A.    Relator sufficiently pleads false statements and false claims. .............................. 24

        1.    Defendants submitted false claims for defective and nonconforming services. ................................................................................................... 26

2. Defendants made false statements to fraudulently obtain MA contracts.. 28

    a. Defendants made false statements as Relator alleges. .................. 30

    b. Defendants' statements were false at the time they were made.... 32

3. Defendants also made or caused to be made false or fraudulent requests for payment to CMS that falsely represented material compliance under *Escobar*. ....................................................................................... 33

4. Defendants' additional arguments are likewise misconceived and unavailing................................................................................................. 36

    a. This case is about fraud, not good faith differences in professional judgment. ........................................................................... 36

    b. This case is about fraud, not about good faith disputes about how to best interpret technical regulations. ........................................... 38

    c. This case is about fraud in violation of core Medicare statutes and regulations, not just the "Medicare Managed Care Manual.".......  39

B. Relator pleads sufficient facts to infer that Defendants acted with at least reckless disregard........................................................................................ 40

1. AIM's fraud was admitted by its executives............................................. 41

2. Anthem acted with intent as revealed by its actions and own executive. . 41

3. Defendant MA Plans were *at least* reckless based on the excessive denial rates they purchased, information they were given, and responsibility for AIM.......................................................................................................... 41

C. Relator sufficiently pleads the materiality of Defendants' fraud. ......................... 43

V. Defendants' other arguments are meritless.................................................................... 48

A. Relator's allegations are not parasitic or publicly disclosed by CMS audits........ 48

1. Defendants fail to articulate the alleged public disclosure at issue. ......... 49

2. Even if there was a public disclosure, Relator is an original source......... 51

B. While not warranted, a dismissal—on any grounds—should be without prejudice. ................................................................................................................. 52

VI. Conclusion ........................................................................................................ 53

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bannon v. Edgewater Med. Ctr.*, 406 F. Supp. 2d 907 (N.D. Ill. 2005) ...................................... 49

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 13

*Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712 (7th Cir. 2017)......... passim

*Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267 (7th Cir. 2016) ............................. 49, 52

*City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058 (N.D. Ill. 2016)........................ 46

*Druding v. Care Alternatives, Inc.*, 164 F. Supp. 3d 621 (D.N.J. 2016) ...................................... 39

*Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153 (3d Cir. 2014) ..................................... 19, 28

*Graves v. Plaza Med. Centers, Corp.* No. 10-23382-CIV, 2015 WL 11199839
 (S.D. Fla. Apr. 1, 2015) ........................................................................................... 42, 43

*Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51 (1984) ............................... 43

*Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936
 (11th Cir. Aug. 15, 2003)................................................................................................... 21

*Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229 (11th Cir. 2016).................... 27

*Junius Constr. Co. v. Cohen*, 178 N.E. 672 (1931) ..................................................................... 44

*Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818 (7th Cir. 2013)........................................... passim

*Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730 (N.D. Ill. 2010) ......................................... 41

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ....................................................... 46

*McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256 (11th Cir. 2005) 38

*Motorola, Inc. v. Lemko Corp.*, No. 08 C 5427, 2010 WL 1474795 (N.D. Ill. Apr. 12, 2010).... 17

*Petri v. Gatlin*, 997 F. Supp. 956 (N.D. Ill. 1997) ...................................................................... 24

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436
 (7th Cir. 2011)........................................................................................ 12, 13, 16, 18

*Rainwater v. United States*, 356 U.S. 590 (1958)........................................................................ 36

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510
 (7th Cir. 2015)................................................................................................................... 53

*Suburban Buick, Inc. v. Gargo*, No. 08 C 0370, 2009 WL 1543709 (N.D. Ill. May 29, 2009) ... 17

*Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918 (7th Cir. 1992)............................................. 13

*United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699
 (7th Cir. 2014)................................................................................................................... 51

*United States ex rel. Baltazar v. Warden*, 635 F.3d 866 (7th Cir. 2011).....................................51

*United States ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 12-CV-10601, 2018 WL 1996829 (D. Mass. Apr. 27, 2018) ................................................................................................41

*United States ex rel. Brown v. Pfizer, Inc.*, No. CV 05-6795, 2017 WL 1344365 (E.D. Pa. Apr. 12, 2017) ................................................................................................46

*United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492 (7th Cir. 2003) ..............49

*United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730 (7th Cir. 2007) .................22

*United States ex rel. Frawley v. McMahon*, No. 11-CV-4620, 2016 WL 5404598 (N.D. Ill. Sept. 28, 2016) ..............................................................................................49

*United States ex rel. Gagne v. City of Worcester*, No. CIV.A. 06-40241, 2008 WL 2510143 (D. Mass. June 20, 2008) ............................................................................................49

*United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016)..................................40

*United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933 (7th Cir. 2012)... 48, 49, 50

*United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102 (7th Cir. 2014)...........................................................................................................22

*United States ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872 (N.D. Ill. 2012)...........................................................................................................17

*United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009)..................................19

*United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775 (7th Cir. 2016) ...........................37

*United States ex rel. Hastings v. Wells Fargo Bank, NA, Inc.*, 656 F. App'x 328 (9th Cir. 2016).............................................................................................................52

*United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112 (D.C. Cir. 2015)................... 12, 21, 50

*United States ex rel. Heath v. Wisconsin Bell, Inc.*, 111 F. Supp. 3d 923 (E.D. Wis. 2015)........36

*United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006)......................31

*United States ex rel. Howard v. KBR, Inc.*, 139 F. Supp. 3d 917 (C.D. Ill. 2015) ........... 14, 37, 38

*United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377 (1st Cir. 2011)..............25

*United States ex rel. Keen v. Teva Pharm. USA Inc.*, No. 15 C 2309, 2017 WL 36447 (N.D. Ill. Jan. 4, 2017) ........................................................................................ 22, 53

*United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158 (N.D. Ill. 2007) ... 20

*United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999) .....................38

*United States ex rel. Lisitza v. Par Pharm. Cos.*, 276 F. Supp. 3d 779 (N.D. Ill. 2017) ........ 22, 49

*United States ex rel. Litwiller v. Omnicare, Inc.*, No. 11-CV-8980, 2014 WL 1458443 (N.D. Ill. Apr. 14, 2014) ........................................................................................ 20

*United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009) ............. 13, 19, 23

*United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005).................. passim

*United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943)......................................................... 26

*United States ex rel. McCarthy v. Marathon Techs., Inc.*, No. 11-CV-7071, 2014 WL 4924445 (N.D. Ill. Sept. 30, 2014) ....................................................................................... 16

*United States ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643 (N.D. Ill. 2015) ......................... 49

*United States ex rel. McGinnis v. OSF Healthcare Sys.*, No. 11-CV-1392, 2014 WL 2960344 (C.D. Ill. July 1, 2014) ........................................................................................ 22

*United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494 (8th Cir. 2016) ........................ 29

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294 (3d Cir. 2016)....................................................................................................... 51, 52

*United States ex rel. Myers v. Am.'s Disabled Homebound, Inc.*, No. 14 C 8525, 2018 WL 1427171 (N.D. Ill. Mar. 22, 2018) .................................................................. 16

*United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29 (1st Cir. 2017)........ 21, 27

*United States ex rel. Roberts v. Lutheran Hosp.*, No. CIV. 1:97C-174, 1998 WL 1753335 (N.D. Ind. Apr. 17, 1998)................................................................................... 37

*United States ex rel. Ryan v. Lederman*, No. 04-CV-2483, 2014 WL 1910096 (E.D.N.Y. May 13, 2014) ...................................................................................... 39

*United States ex rel. Salmeron v. Enter. Recovery Sys., Inc.*, 464 F. Supp. 2d 766 (N.D. Ill. 2006)....................................................................................................... 15

*United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125 (E.D. Pa. 2012).......... 19

*United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1183 (9th Cir. 2016)................................................................................... 13, 19, 21, 22

*United States ex rel. Trombetta v. EMSCO Billing Servs., Inc.*, Nos. 96 C 226, 99 C 151, 2002 WL 34543515, at *4 (N.D. Ill. Dec. 5, 2002) ........................................................ 20

*United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719 (N.D. Ill. 2007)....................................................................................... 19, 28, 32

*United States ex rel. Upton v. Family Health Network, Inc.*, No. 09 C 6022, 2013 WL 791441 (N.D. Ill. Mar. 4, 2013) .................................................................... 19, 27, 29, 32

*United States ex rel. Walner v. Northshore Univ. Healthsystem*, 660 F. Supp. 2d 891 (N.D. Ill. 2009)....................................................................................................... 17

*United States ex rel. Youn v. Sklar*, 273 F. Supp. 3d 889, 897-98 (N.D. Ill. 2017) ............... 37, 38

*United States ex rel. Young v. Suburban Home Physicians*, No. 14-CV-02793, 2017 WL 2080350 (N.D. Ill. May 15, 2017) ......................................... 17

*United States ex rel. Ziebell v. Fox Valley Workforce Dev. Bd., Inc.*, 806 F.3d 946 (7th Cir. 2015)............................................................................... 49

*United States ex rel. Zverev v. USA Vein Clinics of Chicago, LLC*, 244 F. Supp. 3d 737 (N.D. Ill. 2017)................................................................. 16, 17

*United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255 (5th Cir. 2014) .................................. 41

*United States v. Bornstein*, 423 U.S. 303 (1976) .................................................... 25, 26

*United States v. Kinetic Concepts, Inc.*, No. 08-cv-01885, 2017 WL 2713730 (C.D. Cal. Mar. 6, 2017) .................................................................. 39

*United States v. King-Vassel*, 728 F.3d 707 (7th Cir. 2013).......................................... 40

*United States v. Mack*, No. CIV.H-98-1488, 2000 WL 33993336 (S.D. Tex. May 16, 2000)..... 28

*United States v. R&F Properties of Lake Cty., Inc.*, 433 F.3d 1349 (11th Cir. 2005).................. 21

*United States v. Rivera*, 55 F.3d 703 (1st Cir. 1995) ................................................... 26

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008)................................................. 45

*United States v. Sanford-Brown, Ltd.*, 788 F.3d 696 (7th Cir. 2015) ................................... 17, 23

*United States v. Science Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010).................... 27

*United States v. Triple Canopy, Inc.*, 857 F.3d 174 (4th Cir. 2017)............................................. 34

*United States. ex rel. Campie v. Gilead Sciences, Inc.,* 862 F.3d 890 (9th Cir. 2017) ................ 46

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016)....... passim

*United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103 (1st Cir. 2016) ................................................................................... 46, 47

*Williamson v. Curran,* 714 F.3d 432 (7th Cir. 2013)................................................... 11

**Statutes**

31 U.S.C. § 3729........................................................................................ passim

31 U.S.C. § 3730 ...................................................................................... 48, 51

42 U.S.C. § 1395w-22 ........................................................................... 1, 2, 5, 27

42 U.S.C. § 1395w-23 ...................................................................................... 18

42 U.S.C. § 1935w-27................................................................................. 23, 30, 33

**Regulations**

42 C.F.R. § 422.101 ...................................................................................... 5, 30, 38

42 C.F.R. § 422.112 ............................................................................................. 1, 5

42 C.F.R. § 422.252 ................................................................................................. 35

42 C.F.R. § 422.254 ...................................................................................... 11, 31, 35, 43

42 C.F.R. § 422.256 ................................................................................................. 43

42 C.F.R. § 422.304 ................................................................................................. 18

42 C.F.R. § 422.503 ................................................................................................. 42

42 C.F.R. § 422.504 ......................................................................................... passim

42 C.F.R. § 422.562 ................................................................................................. 31

42 C.F.R. O Part 422, Subpart M ........................................................................... 30

42 C.F.R. Part 422, Subpart K ............................................................................... 23

**Other Authorities**

Brief of the United States Opposing a Motion to Dismiss, *United States ex rel. Poehling v. UnitedHealth Group, Inc., et al.*, (C.D. Cal. Jan. 29, 2018) (No. 2:16-cv-08967), 2018 WL 549781 ................................................................................................................. 47

CMS, Medicare Managed Care Manual, Chapter 7 – Risk Adjustment (September 19, 2014)... 35

CMS, Medicare Managed Care Manual, Chapter 11 – Medicare Advantage Application Procedures and Contract Requirements, § 11.110.2 (April 25, 2007)..................................... 42

CMS, Part C Organization Determinations, Appeals and Grievances (ODAG) Program Area: Audit Process and Data Request, OMB No: 0938-1000 (Expires: 04/30/2020) CMS-10191.. 50

**Rules**

Rule 8 ................................................................................................................. 12, 13, 17

Rule 9(b) ............................................................................................................... passim

Rule 12(b)(6).............................................................................................................. 47

## I. Introduction

This case alleges that Defendants opportunistically and wrongfully cheated the federal government by denying healthcare coverage that was promised to Medicare beneficiaries. The fraud alleged in the Second Amended Complaint (ECF No. 121, "SAC") goes to the very essence of the bargain that the government strikes with every Medicare Advantage ("MA") insurance plan. In return for allowing private entities to offer health coverage to Medicare beneficiaries, giving them access to a massive market from which they were otherwise excluded, the government requires those entities to both guarantee seniors the same benefits and make individualized coverage determinations using the same standards as traditional Medicare. 42 U.S.C. §§ 1395w-22(a)(1)(A) and (g)(1)(A); 42 C.F.R. § 422.112(a)(6)(ii). These two requirements are not incidental conditions of participation or payment; rather, they are at the core of the bargain that every MA plan strikes with the federal government. They are the *sine qua non* of the federal government's willingness to allow the private sector to enter and profit from the Medicare marketplace in the first place. These requirements exist both to prevent MA plans from taking advantage of seniors by sacrificing coverage to maximize profits and to minimize the costs of government oversight by establishing mandatory rules. This case, therefore, concerns matters of great public importance, particularly as enrollment in MA insurance plans grows, and seniors become increasingly vulnerable to the practices alleged in the SAC.

The Defendants in this matter are (1) MA Plans,[1] which are private insurance companies

---

[1] "Defendant MA Plans" include the following Defendants: Anthem Health Plans of Kentucky, Inc.; Anthem Health Plans of New Hampshire, Inc.; Anthem Health Plans, Inc.; Anthem Insurance Companies, Inc.; Blue Cross of California; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross and Blue Shield Healthcare Plan of Georgia; Community Insurance Co.; Compcare Health Service Insurance Corp.; Empire Healthchoice HMO, Inc.; Empire Healthchoice Assurance, Inc.; Health First Health Plans, Inc.; HMO Colorado, Inc.; HMO Missouri, Inc.; Blue Cross of Idaho Care Plus, Inc.; Blue Cross Blue Shield of Michigan Mutual Insurance Company; Blue Cross and Blue Shield of North Carolina; Moda Health Plan, Inc.; Priority Health; Providence Health Plan; Providence Health Assurance; Regence BlueCross BlueShield of Oregon; Regence BlueCross BlueShield of Utah; Regence

that operate Medicare Advantage health insurance plans; (2) their contractor that designed and implemented the fraudulent scheme, American Imaging Management, Inc. ("AIM"); and (3) Anthem Inc., the parent company of AIM and many of the Defendant MA Plans. As a general matter, MA plans profit by keeping the cost of medical care they insure less than the fixed monthly payments they receive from the government. However, as a fundamental condition of allowing private companies to offer Medicare Advantage insurance plans to seniors, the government sets a floor for the minimum coverage each plan must provide. Accordingly, in the contracts between Defendant MA Plans and the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS"), the Plans pledge to cover the same services covered by traditional Medicare (i.e. all "basic benefits" covered by Medicare as determined by CMS). 42 U.S.C. § 1395w-22(a)(1)(A). Thus, if traditional Medicare would cover and pay for a medical service, then an MA plan must too.

The Defendant MA Plans, however, failed to deliver on this fundamental commitment. As the Relator, Dr. Susan Nedza ("Relator") alleges in the SAC, Defendant MA Plans fraudulently contracted with CMS knowing they had not and would not provide the full coverage required under their contracts while, at the same time, collecting the full MA payment each month as if they had provided all required coverage. This constitutes a straightforward fraud: Defendants contractually promised and were paid to deliver one thing, but in fact delivered something far less.

To accomplish their scheme, Defendant MA Plans subcontracted coverage pre-authorization decisions (i.e. allegedly checking whether a medical service is covered by

---

BlueShield; Regence Blue Shield of Idaho; Asuris Northwest Health; and PacificSource Community Health Plans. "Defendants" include, in addition to the Defendant MA Plans, American Imaging Management, Inc., and its parent company Anthem, Inc.

2

Medicare) to Defendant AIM. As alleged in the SAC, AIM's pre-authorization, or utilization management ("UM"), review process was intentionally designed to increase denials of coverage and thereby help the Defendant MA Plans increase profits by denying the care that Medicare requires and CMS purchased. In doing so, Defendant AIM consistently and purposely ignored Medicare requirements, denied whole categories of requests without making individualized determinations, and based denials on cost rather than medical needs or medical judgment.

Not surprisingly, the Defendants' Motions to Dismiss[2] do not focus on their fraud, and instead attempt to distract the Court by raising nearly every technical defense available under the False Claims Act ("FCA"), without squarely addressing the gravamen of the fraud allegations. Specifically, the Defendants wrongly contend that:

- The SAC is not pled with sufficient particularity and does not satisfy Rules 9(b) or 8 for lack of details about (i) the contracts between AIM and the MA plans, and between the MA Plans and CMS; (ii) specific false claims submitted to CMS; (iii) the MA Plans' knowledge, and because (iv) some allegations are pled en masse;

- the MA Plans do not submit any "claims" for payment;

- the MA Plans' promises of compliance (i.e. certifications) are too general and thus not actionable under the FCA, and further because they were not false when signed, this case involves at most a breach of contract;

- the alleged violations are matters of medical judgment related to mere technical disputes or non-binding CMS guidance (or both) and are not objectively false;

- there are no false implied certifications;

- the violations alleged in the SAC are not material; and,

---

[2] Relator files this omnibus response to the seven pending motions to dismiss: Motion of Health First Health Plan, ECF No. 101, supported by memorandum ECF No. 102 ("MTD 102") and supplemental memorandum ECF No. 130 ("MTD 130"); Motion of Priority Health, ECF No. 133, supported by memorandum ECF No. 136 ("MTD 136"); Motion of Anthem Defendants, Blue Cross of Idaho Care Plus, PacificSource, and Moda, ECF No. 144, supported by memorandum ECF No. 145 ("MTD 145"); Motion of Providence, ECF No. 149, supported by memorandum ECF No. 150 ("MTD 150"); Motion of Blue Cross Blue Shield of Michigan, ECF No. 152, supported by Memorandum ECF No. 153 ("MTD 153"); Motion of Blue Cross Blue Shield of North Carolina ECF No. 157 ("MTD 157"); Motion of Regence Defendants, ECF No. 160 ("MTD 160").

- the allegations were already entirely publicly disclosed.

As demonstrated below, the Defendants' contentions are without merit. Defendants systemically denied seniors access to medical care for no reason but to increase profits through various nefarious techniques that consciously violate Medicare's statutory, regulatory, and contractual requirements, which are at the very heart of the bargain between Defendants and the government. Defendants' false statements and claims, both to secure annual MA contracts and claim significant monthly payments from the government, constitute the precise type of fraud that violates the FCA. The details Defendants contend are missing are both unnecessary at this stage of the case and necessarily flow from the requirements of the MA program. Further, rather than relying on allegations that had been previously disclosed, Relator provides striking admissions and valuable insider information from her position as a former top executive at AIM. This Court should deny Defendants' Motions to Dismiss in their entirety.

## II. The SAC more than adequately pleads Defendants' intentional scheme to defraud the federal government.

As described below, Dr. Nedza provides more than sufficient detail to put each Defendant on notice of its role in the fraud scheme, and to demonstrate that she has "some basis" for her allegations. To require more—or different—details than the SAC contains, would elevate form over substance in the precise way that the Seventh Circuit has repeatedly and rightly rejected. As recently observed in *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016), courts must not "take an overly rigid view" of Rule 9(b); its requirements are not captured by any one-size fits all formula. *See also Cook Cnty. v. United States ex rel. Chandler,* 538 U.S. 119, 129 (2003) ("Congress wrote [the FCA] expansively, meaning 'to reach all types of fraud, without qualification.'"). The FCA creates liability for the intentional and wide-ranging scheme to defraud Medicare alleged here.

4

A. <u>The SAC explains that Defendant MA Plans hire AIM to generate profits at the expense of patients.</u>

The Defendant MA Plans hired AIM to review pre-authorization requests, in significant part, to deny such requests without determining their validity under the individualized procedures required by Medicare.[3] If a request is denied, the MA plan does not pay for the medical service and the beneficiary does not receive the medical care (or pays out of pocket). SAC ¶ 57. Denying care is more profitable for MA plans because the government pays them a fixed amount, called a capitation payment, every month for each patient that is covered by the MA plan. SAC ¶ 30. The deal here was simple: Defendant MA Plans, in effect, paid AIM $5 to deny $15 in care. Defendants profited and the patients lost.

Defendant MA plans, however, are not authorized to set Medicare coverage rules. The legally mandated coverage rule for all MA plans is clear: each plan "shall provide to members . . . [the] benefits under the original Medicare fee-for-service program," except for hospice care. 42 U.S.C. § 1395w-22(a)(1)(A) (the "same benefits" or "basic benefits" rule of Medicare Advantage); 42 C.F.R. §§ 422.101(a) and (b) (also stating explicitly that the same benefits rule requires compliance with National Coverage Determinations ("NCDs"), Local Coverage Determinations ("LCDs"), and the Medicare Manuals), SAC ¶¶ 35-38. Accordingly, MA plans contract to provide services "[i]n a manner consistent with professionally recognized standards of health care, all benefits covered by Medicare." 42 C.F.R. § 422.504(a)(3)(iii), SAC ¶ 35.

MA plans are also required to make individualized coverage determinations based on Medicare rules. 42 U.S.C. § 1395w-22(g)(1)(A); 42 C.F.R. § 422.112(a)(6)(ii). These twin rules—the same benefits rule and individualized determination of coverage rules—are the

---

[3] Insurance plans require pre-authorization of coverage for medical services such as advanced diagnostic imaging (e.g. CT, MRI, or PET scans) before the medical service occurs. SAC ¶¶ 51-52.

5

foundation of the entire MA program. Medicare Advantage, thus, changes the way medical providers are paid to a managed care model, but it does not change the amount or type of care that Medicare beneficiaries are entitled to under federal law. SAC ¶ 32. [4]

In this case, Relator alleges that Defendants (1) failed to provide the full Medicare coverage mandated by their contracts with the government, yet fraudulently claimed (or caused to be claimed) payments under those contracts; (2) fraudulently promised to provide full Medicare coverage to induce such payments; and (3) knew that they did not and would not provide full Medicare coverage. The SAC further alleges that AIM's UM review process intentionally denied coverage that Medicare would provide. As this case proceeds, Defendants may attempt to dispute these allegations. However, at this stage of the litigation, the question is simply whether these allegations, if proven, establish a violation of the FCA. They overwhelmingly do.

Relator Dr. Nedza was Chief Medical Officer for AIM from July 2012 to January 2015. SAC ¶ 16. Prior to that, she served five years as a CMS official working with insurance companies on Medicare coverage policies and as a Vice President and Medical Director for the American Medical Association. SAC ¶ 16. At AIM, Relator was part of the executive leadership team, where she oversaw the development of clinical guidelines for coverage determinations and regulatory compliance. SAC ¶ 16. Though her position did not involve the day-to-day review of pre-authorization requests, she witnessed firsthand the design of rules and practices calculated to deny care with no medical basis and in violation of Medicare requirements. She also witnessed the repeated admissions of AIM executives that Defendants violated Medicare coverage rules in

---

[4] Even Defendants acknowledge, as they must, that "MA plans agree in their contracts with CMS to provide basic Medicare benefits '[i]n a manner consistent with professionally recognized standards of health care,' and to comply with the U.S. Code and the Code of Federal Regulations," MTD 153 at 8-9, and that "MA plans must have effective procedures in place to make individualized determinations of Medicare coverage," MTD 145 at 6.

search of profits. Relator's allegations are not just inferences, but confessions straight from the top. These admissions include:

a. In 2013, AIM prepared marketing materials admitting that under Medicare coverage rules, 0.5% of requests would be denied. AIM prevented 5% to 9% of requests, but admitted some of the denials "will likely be overturned by CMS." SAC ¶ 110.

b. On October 15, 2013, Dr. Julie Thiel, AIM Senior Vice President, proposed that AIM simply approve all MA requests until AIM could figure out how to stop "incorrectly denying" MA requests. SAC ¶ 113. AIM leadership refused.

c. On October 10, 2014, Anne Pukstys, AIM Vice President of Client Management, explained that even if AIM offered a Medicare compliant review *option*, client insurance plans would choose to continue AIM's unlawful review process while "compliance risk will be taken under advisement and will be weighed against the business / financial risk" of following the law. SAC ¶ 129.

d. In 2014, Randy Hutchinson, AIM's Chief Operating Officer, explained that AIM would not bring its review process into compliance because that "will impact the value" of AIM to its clients. SAC ¶ 116.

e. In 2014, Jennifer Dullum, AIM's Vice President of Compliance, remarked that AIM's fraudulent review process risked landing its clients in jail. SAC ¶ 115.

f. Similarly, at the end of 2014, Brandon Cady, AIM's CEO, told Dr. Nedza that he wanted [Anthem executive] "Mary McCluskey's name on an email" approving AIM's fraud "so when we get caught by CMS, it's on her." Mr. Cady wanted Anthem, not AIM, to face the criminal consequences and responsibility if CMS barred the plans from the Medicare Advantage program. SAC ¶ 141.

g. At the end of 2014, Defendant Blue Cross Blue Shield ("BCBS") of Michigan informed AIM that the Plan should self-report to CMS because of its violations of Medicare's requirements, but never did. SAC ¶ 146.

AIM knew it was committing fraud, and that it was causing the MA Plans to do so as well. AIM, in fact, studied and quantified the magnitude of the fraud. SAC ¶¶ 108-110. In 2013, AIM Senior Medical Director Dr. Thomas Power studied 164 MA requests for pre-authorization that had been denied by AIM and determined that 160 (or 97.5%) of those requests should have been approved under Medicare coverage rules. SAC ¶ 108. Despite this knowledge, AIM

repeatedly chose to continue to perpetuate fraud on the government. For instance, AIM experimented with Medicare compliance, but repeatedly rejected compliance to maximize profits. From January to April 2014, when AIM tested a more compliant review process, denials dropped "to near 0%." SAC ¶¶ 109, 118. Again, from September to December 2014, AIM tested a partially-compliant review process—and denials dropped to about 1%. SAC ¶ 125. Further, rather than provide and ensure a compliant review for all of its clients, AIM offered and marketed review processes with different *levels* of compliance, to give each Defendant MA Plan the *choice* to follow Medicare coverage rules. SAC ¶¶ 128-129. Defendants chose fraud. AIM's UM review process was so flawed that by 2012, Anthem forbid its own MA Plans from using that review process. SAC ¶¶ 137-138. Yet, in service of profits, Anthem condoned AIM's continued use of that same non-compliant review process for other insurers. SAC ¶¶ 132-35.

AIM also explicitly discussed its lack of Medicare compliance with its clients. Although some Defendant MA Plans expressed reservations about the fraud, none withdrew, preferring profits to compliance. For example, AIM had to convince "business decisionmakers" at MA plans of the profitability of AIM's fraudulent review process to overcome the concerns of the Plans' "compliance teams'" about AIM's practices. SAC ¶ 144. Defendant BCBS of North Carolina, including its medical director Dr. Eugenie Komives, specifically raised Medicare compliance issues with AIM over the years. SAC ¶ 145. Defendant Regence BlueShield of Idaho refused the "more compliant" review process that AIM was developing. SAC ¶ 129. And Defendant BCBS of Michigan informed AIM that the Plan should just turn itself in to CMS because of the compliance issues. SAC ¶ 146.

All Defendant MA Plans knew from contracts and communications with AIM that AIM did not comply with Medicare rules for coverage determinations. SAC ¶ 144. AIM reported to

Defendant MA Plans on a monthly basis the impossibly high denial rates that could not plausibly be achieved without violating Medicare rules. SAC ¶¶ 7, 147. Any Defendant MA Plan that pretends not to have known that there was fraud behind AIM's ability to drastically reduce costs was, at a minimum, reckless for not monitoring the situation as Medicare requires. Under Medicare rules, each MA Plan retains full responsibility for the actions of their subcontractors. SAC ¶¶ 42-44.

Medicare requires an individualized review of each senior's medical situation to determine whether the requested medical service is covered by Medicare. SAC ¶¶ 37-38. AIM, however, did not determine coverage by applying Medicare coverage rules to each individual request.[5] Instead, AIM rigged the review process in the following ways:

a. "Turning off the algorithms" (refusing to approve all requests for a certain service for a particular insurance plan for *no reason* other than AIM was in danger of missing a contractual target for cost savings for that plan), SAC ¶¶ 60-65;

b. "Case aging" (denying care with no purported medical justification when a provider failed to call AIM within a business day), SAC ¶¶ 74-76;

c. Secretly preventing medical providers from submitting full medical information by setting fax machines to stop printing after 10 pages, SAC ¶¶ 77-80;

d. Implementing flawed computerized algorithms that impose rules with no medical basis to refuse to approve care, SAC ¶¶ 66-71;

e. Prohibiting AIM staff from making more than one attempt to contact a medical provider, as required by CMS, before denying care, SAC ¶¶ 72-73;

f. Training and incentivizing AIM employees to deny requests, SAC ¶¶ 95-105; and,

g. Covering up wrongful denials by falsely representing AIM's restrictive rules as official Medicare policy in written denial letters, SAC ¶¶ 93-94.

Contrary to Defendants' argument, Relator is not alleging that Defendants exercised

---

[5] The SAC details how AIM's UM review process operated to deny medical services that were covered by Medicare. To access a medical service that requires pre-authorization, once the provider determines it is medically necessary, the provider submits a pre-authorization request to AIM via the AIM website or AIM call center. Defendant AIM reviews each request in three steps, none of which comply with Medicare rules. SAC ¶¶ 53-57.

flawed medical judgment; rather, Relator alleges Defendants' refusal to exercise medical judgment. On occasions when a request was considered on the medical merits, AIM made coverage determinations with its own proprietary coverage rules (the "AIM Guidelines"), which were far more limiting than the Medicare coverage rules that Defendants contracted to follow. SAC ¶¶ 81-92. Defendants categorically refused coverage in violation of Medicare coverage rules by denying requests such as: (i) imaging/scans of adjacent body parts (e.g. for abdominal pain, Defendants would allow a scan of only the abdomen or pelvis, but not both, even when both were necessary for a proper diagnosis); (ii) bilateral imaging (e.g. for pain and likely arthritis in both knees, Defendants would allow a scan of only one); (iii) advanced imaging scans, like a CT, unless preceded by an x-ray (even if CT was ordered because an x-ray would be insufficient); and (iv) advanced imaging scans unless preceded by physical therapy (causing weeks or months of delay and pain, if not damage from undergoing physical therapy on a broken bone or other injured body part). SAC ¶ 89. Likewise, AIM denied "simultaneous ordering of multiple examinations," even when allowed by Medicare. SAC ¶ 101.

Further, when the AIM Guidelines conflicted with the mandatory Medicare coverage rules, AIM's express policy was to follow its own AIM Guidelines and violate Medicare coverage rules. SAC ¶¶ 90-91. Medicare requires the opposite. As a direct result of their wrongful practices, Defendants thus forced patients to go without the imaging ordered by their doctors to diagnose and treat potentially life-threatening conditions, or to pay out-of-pocket for medical services that the patient was entitled to receive and that CMS had already paid Defendants to cover. SAC ¶¶ 150-151.

      B.   The SAC describes how the submission of false claims flowed directly from Defendants' fraud scheme.

The SAC alleges that all Defendant MA Plans operate MA insurance plans, SAC ¶ 4, the

revenue source of which is primarily government payments requested on behalf of each Plan beneficiary each month. To receive payment, each MA plan must contract with CMS and annually submit a separate "bid package" based on the services the MA plan pledges to provide, which at a minimum include all Medicare services. SAC ¶¶ 32, 44, 156; 42 C.F.R. § 422.254. *See also* 2016 MA Contract Template ("MA Contract," *attached as* Exhibit 1) and CY 2016 Benefit Attestation ("Benefit Attestation," Attachment C to the MA Contract and *attached as* Exhibit 2).[6] CMS then pays the MA plans monthly capitation payments based on those bids. SAC ¶¶ 30, 32, 44, 156. In the documentation for each monthly payment, MA plans certify and report to CMS the number of beneficiaries for whom the MA plan provided all benefits promised in its annual bid package. SAC ¶¶ 4, 44. *See* Attestation of Enrollment Information (Exhibit 1, MA Contract at RESP0008-09, 0026, "Attachment A") and Attestation of Risk Adjustment Data (Exhibit 1, MA Contract at RESP0008-09, 0027, "Attachment B").

In some FCA cases there might be doubt whether a defendant claimed payment from the government; however, that is not the case here where the federal government pays Defendants every month for every senior served by the Defendant MA Plans' business. Defendant MA Plans exist by virtue of government payments and thus all necessarily submitted claims for payment.

In their contracts with CMS and accompanying annual attestations, Defendant MA Plans certified compliance with MA rules, including—most fundamentally—that they are providing *all* Medicare benefits and making individualized coverage determinations. SAC ¶¶ 4, 32, 39-41, 44,

---

[6] As Defendants note, MTD 145 at 4 n.4, "[o]n a motion to dismiss, courts may consider 'information that is properly subject to judicial notice.'" (quoting *Williamson v. Curran,* 714 F.3d 432, 436 (7th Cir. 2013)). The CMS MA contract and certification templates, as official government documents publicly available from the CMS website, are just such documents. The MA Contract and Benefit Attestation are available from CMS at www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/ (select "2016 Medicare Advantage and Part D Contract Templates [ZIP, 1MB]," files "(01) 2016 CCP Contract" and "(31) 2016 Benefit Attestation") (last visited May 31, 2018). For the convenience of the Court, copies are attached as Exhibits 1 and 2.

149, 156; Exhibit 1, MA Contract at RESP0003; Exhibit 2, Benefit Attestation. These repeated

contractual statements, certifications, and monthly payment claims—before, during, and after

using AIM's fraudulent review process—were knowingly false and thus fraud under the FCA.

### III. Relator alleges a plausible intentional fraud scheme with sufficient particularity to meet Rules 8 and 9(b).

#### A. There is no formula for pleading fraud; Rule 9(b) only requires sufficient particularity to ensure notice to defendants and that there is "some basis" for the complaint.

The requirements of Federal Rule of Civil Procedure Rule 9(b) are neither hypertechnical

nor fixed. Although Defendants contend that Relator fails to adequately "describe the 'who,

what, when, where, and how' of the fraud,'" the Seventh Circuit has made clear that is merely a

shorthand, and it is not an inflexible requirement. *Pirelli Armstrong Tire Corp. Retiree Med.*

*Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011). Indeed, the Seventh Circuit

has warned both litigants and courts against taking "an overly rigid view" of Rule 9(b) because

"the precise details that must be included in a complaint 'may vary on the facts of a given case.'"

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir.

2016) (citations omitted). The touchstone of Rule 9(b) is to ensure fair notice to defendants and

to "screen against spurious fraud claims." *Id.* at 776.[7]

The Seventh Circuit also refuses to penalize relators for not pleading details that can be

reasonably inferred but as to which they have no access. *Id.* at 778. For example, the relator in

*Presser* did not plead the details of claims or government payments. The Seventh Circuit refused

to dismiss the complaint on that basis, because, as in the instant case, "the alleged facts

---

[7] "Rule 9(b) does not inflexibly dictate adherence to a preordained checklist of 'must have' allegations… the point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015).

necessarily led one to the conclusion that the defendant had presented claims to the Government." *Id.* (discussing *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853–54 (7th Cir. 2009)). On a motion to dismiss, "an inference is enough." *Id.* (quoting *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 839 (7th Cir. 2013)).[8]

Rule 9(b) does not require pleading evidence or impossible detail, a standard that would effectively gut the FCA and allow many who defraud the government to escape liability. Instead, it requires "some basis for [the] accusations of fraud," taking into consideration the relator's access to information, and that the case is not brought for "ulterior purposes." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992). *See also United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (reversing dismissal of FCA claim against MA plans and their subcontractors where relator provided "some factual basis" to satisfy Rule 9(b)). Relator amply satisfies this standard.[9]

### B. Relator supplies the factual basis required by Rule 9(b).

The SAC's allegations stem from Dr. Nedza's personal knowledge, experience, conversations, written communications and other documents she encountered as AIM's Chief Medical Officer. She alleges—as a witness to the statements—that Defendant executives admitted violating Medicare rules and choosing profits over compliance. *Supra* II.A (admitting "incorrect" denials, that AIM's review process was not Medicare "compliant," and the possibility of criminal sanctions). Relator details Defendants' blatant disregard for Medicare coverage

---

[8] Even pleading on information and belief "is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions' … [that] make the allegations *plausible.*" *Pirelli*, 631 F.3d at 443.

[9] Rule 9(b) also does not supersede Rule 8, which requires merely "a short and plain statement of the claim showing that the pleader is entitled to relief." *United States ex rel. Sloan v. Waukegan Steel, LLC*, No. 15 C 458, 2018 WL 1087642, at *2 (N.D. Ill. Feb. 28, 2018). The SAC satisfies Rule 8 because it is "plausible on its face;" its "[f]actual allegations … raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

13

requirements by engaging in practices such as "case aging" and "turning off the algorithms," to withhold approval of medical services without medical justification solely to increase denials; arbitrarily setting fax machines to stop printing medical records after the first 10 pages; and restricting contacts to actual treating physicians. Anthem likewise concluded that AIM was breaking the law but refused to stop it; at least one Defendant MA Plan concluded that the scheme warranted self-reporting to CMS; AIM itself studied how far out of compliance it was and concluded that 97.5% of the denials violated Medicare coverage rules.

Although Relator does not provide the names and dates for those patients whose requests were wrongly denied, or of the many thousands of others who were similarly victimized by this fraud, such examples are not necessary, especially given that she witnessed AIM executives up to the CEO conclude that its UM review process and the resulting denials of coverage violated Medicare requirements.[10] Indeed, these admissions of wrongdoing are a stronger basis of intentional fraud than any individual patient examples. *See United States ex rel. Howard v. KBR, Inc.*, 139 F. Supp. 3d 917, 943-44 (C.D. Ill. 2015) (holding an FCA complaint sufficiently pled with statements by executives that they violated reasonable cost contracting rules, even without identifying any particular example of an unreasonable cost).

### C. Relator provides sufficient notice to each Defendant of its role in the fraud.

The SAC sets forth each Defendant's role in the systemic fraud and thus reasonably satisfies the "fair notice" requirement of Rule 9(b). *United States ex rel. Cieszyski v. LifeWatch Servs., Inc.*, No. 13 CV 4052, 2015 WL 6153937, at *11 (N.D. Ill. Oct. 19, 2015). "[A] plaintiff is required to provide only a 'general outline' of the alleged scheme sufficient to put defendants

---

[10] While Relator does not at this juncture identify the names or dates of patient-victims of the Defendants' fraudulent scheme, she can and does allege facts that leave no doubt that they exist, and it will be a relatively simple matter to identify them in discovery.

on notice about their roles in the fraudulent or false activity." *United States ex rel. Salmeron v. Enter. Recovery Sys., Inc.*, 464 F. Supp. 2d 766, 768 (N.D. Ill. 2006).

AIM's role. At the center of the fraud, AIM designed and implemented the unlawful UM review process as a sub-contractor for each Defendant MA Plan. SAC ¶¶ 5-6, 51-105, 153. Relator specifies by name numerous key executives and their knowledge of and role in the scheme. *E.g.,* CEO Brandon Cady (SAC ¶¶ 75, 108, 111, 114, 117, 141), COO Randy Hutchinson (SAC ¶¶ 62, 108, 110, 111, 113, 114, 116, 130), Senior VP Julie Thiel (SAC ¶¶ 62, 98, 108, 111, 113, 114, 124), Chief Strategy Officer Michael Backus (SAC ¶¶ 62, 111), VP of Compliance Jennifer Dullum (SAC ¶¶ 73, 115), VP of Client Management Ann Pukstys (SAC ¶¶ 110, 125, 129), and VP Christine Shah (SAC ¶¶ 110, 113, 128, 129, 130). AIM thus caused the submission of false claims and false statements material to claims.

Anthem's role. Anthem, the parent company of AIM, caused the submission of false claims and false statements material to claims. First, Anthem executives specifically approved and authorized the scheme implemented by AIM. SAC ¶¶ 132, 134, 135. Second, Anthem directed its subsidiary MA plans to use AIM's unlawful UM review process until 2011 or 2012, and again starting in late 2014. SAC ¶¶ 23, 133, 135, 137, 140. Relator identifies Anthem executives involved by name, often based on her personal conversations. *E.g.*, National Staff VP and Medical Director for MA Richard Frank (SAC ¶¶ 91, 133, 140), Senior VP of the Clinical Strategy and Programs, Steve Friedhoff (SAC ¶¶ 133, 140), and Vice President Alan Rosenberg (SAC ¶ 134).

Defendant MA Plans' role. Although Defendant MA Plans claim the SAC provides them with "no notice at all of the alleged fraudulent conduct," MTD 102 at 5, the SAC clearly demonstrates otherwise. Relator alleges that the Plans knew of the fraud, including that they:

15

(1) operated MA insurance plans, SAC ¶ 156;

(2) contracted with CMS to provide Medicare coverage, SAC ¶¶ 4, 144, 156;

(3) contracted with AIM to increase profits through denial of pre-authorization of services for MA beneficiaries, knowing AIM violated Medicare rules, SAC ¶¶ 6, 23, 44;

(4) denied medical care upon AIM's denial of pre-authorization, SAC ¶¶ 51, 150;

(5) pledged and certified, knowingly and falsely, compliance with Medicare rules to fraudulently obtain monthly payments from CMS, SAC ¶¶ 4, 8, 143, 149, 156-57; and

(6)  submitted false claims for payment to the government, SAC ¶ 149.

These allegations are more than sufficient to provide notice of their alleged wrongdoing.

Relator is not required to plead specific names of executives at the various corporate

defendants, especially as a former executive for AIM (not the MA Plans). As the Seventh Circuit

held in *Pirelli,* pleading fraud does not require pleading "specific misrepresentations made by

particular [corporate defendant] staffers." 631 F.3d at 446. *See also United States ex rel.*

*McCarthy v. Marathon Techs., Inc.*, No. 11-CV-7071, 2014 WL 4924445, at *3–4 (N.D. Ill.

Sept. 30, 2014) (declining to dismiss an FCA complaint where the identity of who submitted the

claims and text of the certifications were "in the exclusive possession of the defendants").

1.  <u>Group pleading is appropriate where multiple defendants engaged in the same
    conduct.</u>

The Defendants incorrectly contend that the SAC does not satisfy Rule 9(b) because it

pleads "en masse." However, where multiple defendants are alleged to have committed the same

act or performed the same role in a scheme, as here, courts permit group or "en masse" pleading.

*United States ex rel. Myers v. Am.'s Disabled Homebound, Inc.*, No. 14 C 8525, 2018 WL

1427171, at *7 n.4 (N.D. Ill. Mar. 22, 2018) (group pleading permitted because there was no

"lack of clarity" regarding "which defendants allegedly committed which wrongful act(s)" or

"which counts are asserted against which defendants"); *United States ex rel. Zverev v. USA Vein*

*Clinics of Chicago, LLC*, 244 F. Supp. 3d 737, 748–49 (N.D. Ill. 2017) (group pleading permitted because "alleged role of each entity… was the same:  to submit claims for … procedures that were not performed"); *Motorola, Inc. v. Lemko Corp.*, No. 08 C 5427, 2010 WL 1474795, at *5 (N.D. Ill. Apr. 12, 2010) (grouping six defendants permitted when each made same misrepresentation).

In the instant case, the role of each Defendant MA Plan is identical, and referring to them collectively is appropriate. In particular, each of the Defendant MA Plans knowingly submitted false claims to CMS and made the same false statements in contracts and attestations, using the same procedures and forms established by CMS.  Further, where appropriate, the SAC adds context with additional examples about some Defendants. *See, e.g.*, SAC ¶¶ 118-21, 126, 129-30, 136, 141, 144-47. Making allegations against Defendants or Defendant MA Plans here does not deprive any Defendant of notice, unlike the cases cited by the Defendants where en masse pleading lumped together disparate defendants who had not made identical false statements in the same documents.[11]

It would serve no purpose, and be contrary to Rule 8, to require Relator to repeat in 27 separate paragraphs, one for each Defendant MA Plan, conduct engaged in by all. *See Motorola, Inc. v. Lemko Corp.*, No. 08 C 5427, 2010 WL 1474795, at *5 (N.D. Ill. Apr. 12, 2010) ("There was no need for [plaintiff] to say the same thing in six separate paragraphs of its complaint").

---

[11] *See United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 706 (7th Cir. 2015) (failed to plead sufficient facts to notify defendant of circumstances of its alleged participation in scheme); *United States ex rel. Young v. Suburban Home Physicians*, No. 14-CV-02793, 2017 WL 2080350, at *6 (N.D. Ill. May 15, 2017) ("generalized assertions, regarding a group of disparate defendants, engaged in various different types of permissible and impermissible practices"); *United States ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872, 879 (N.D. Ill. 2012) (failed to clarify which defendant made statement agreeing to conspiracy); *United States ex rel. Walner v. Northshore Univ. Healthsystem*, 660 F. Supp. 2d 891, 897-99 (N.D. Ill. 2009) (failed to identify the specific role of each defendant in alleged fraud); *Suburban Buick, Inc. v. Gargo*, No. 08 C 0370, 2009 WL 1543709, at *4 (N.D. Ill. May 29, 2009) (failed to identify which of four enterprises "were used by which defendants to conduct which predicate acts" in violation of RICO).

Indeed, Defendants make arguments on behalf of various groupings for the same reasons: efficiency and clarity. *See, e.g.*, MTD 150 (referring to "Providence Health Plan and Providence Health Assurance" as "Providence Plans"); MTD 145 (explaining the role of "MA Plan Defendants" without differentiation). "[T]he requirement in the rules for fraud averments are not at war with the rule that complaints be succinct." *Pirelli*, 631 F.3d at 439 n.1.

> **D.** <u>The Seventh Circuit does not require transaction level details where, as here, the government is indisputably the major payor, making the fact that Defendants submitted claims for government payment a foregone conclusion.</u>

Defendants argue that the SAC lacks sufficient detail about Defendants' false claims for payment and contracts.[12] In the specific context of the MA program, Relator's allegations provide more than sufficient basis to lead to "the conclusion that the defendant had presented claims to the Government." *Presser*, 836 F.3d at 778.

> **1.** <u>Defendants undeniably submitted false claims for payment.</u>

Defendants' contention that Relator fails to plead the submission of false claims ignores the fact that claims inevitably result from operating a Medicare Advantage plan. Rule 9(b) requires no more. In this case, as in *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770 (7th Cir. 2016), the Defendants' revenue comes overwhelmingly from government payments. Defendants' MA plans are funded by monthly capitation payments from CMS (and any applicable co-insurance payments from beneficiaries). *Supra* Section II.B; SAC ¶ 30; 42 U.S.C. § 1395w-23(a)(1)(A); 42 C.F.R. § 422.304. Unlike a medical clinic, for example, which might bill a range of payors—private insurers, the patient, and various government healthcare programs, MA plans bill the government for every beneficiary every month.

---

[12] *See* MTD 145 at 10 ("Pleading a scheme by which false claims *might* have been submitted, without pleading the actual submission of a false claim, is insufficient"); MTD 153 at 3 (complaining about the lack of "dates, signatory or content of any MA contract… or the dates, content, or amount of claims" to CMS).

In such a case, Rule 9(b) does not require the dates, amounts, or other detailed claim examples. *Presser*, 836 F.3d at 777; *Lusby*, 570 F.3d at 853–54. Such an unrealistic view of Rule 9(b) would "take[] a big bite out of *qui tam* litigation." *Id. See also Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155–56 (3d Cir. 2014) (collecting cases and rejecting the rule that relator must plead specific false claims); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (holding that an FCA complaint is sufficient "by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.").

Defendant Priority Health argues, for example, that Relator fails to plead the submission of "any claims for payment or reimbursement to the Government," but admits in the next sentence that "CMS pays a Medicare Advantage plan, such as [defendant], a capitation rate (a fixed amount per member per month)." MTD 136 at 5-6. Capitation payments are the government payments that Defendants "claim." *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 168 (E.D. Pa. 2012) (rejecting as "linguistic maneuvering" the argument that data submitted to facilitate Medicare Part D payment was not an FCA "claim"); Exhibit 1, MA Contract RESP0026-27, Attachments A and B ("the MA Organization hereby requests payment"). *See also Swoben*, 848 F.3d 1161 (FCA claim in the MA program); *United States ex rel. Upton v. Family Health Network, Inc.*, No. 09 C 6022, 2013 WL 791441 (N.D. Ill. Mar. 4, 2013) (FCA claim as to Medicaid capitated payments); *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719 (N.D. Ill. 2007) (same). [13]

---

[13] To the extent Defendants argue there is no "claim" because CMS pays the capitation payment *before* Defendants submit some of the related paperwork, such an argument is without merit. Dr. Nedza alleges fraud in the contracts, forms, attestations, submission and certifications that Defendants used to obtain the MA contracts and capitation payments. *Infra* Section IV.A. The FCA does not hinge on minor technicalities; it covers this fraud: "Congress wrote [the FCA] expansively, meaning 'to reach all types of fraud, without qualification.'" *Cook Cnty. v. United States ex rel. Chandler,* 538 U.S. 119, 129 (2003).

Rule 9(b) does not require Relator to plead additional details of false claims to demonstrate that this case is not a fishing expedition. She "has done better than point to a single fraudulent bill—she has explained how several specific billing practices led to . . . thousands of fraudulent bills." *United States ex rel. Trombetta v. EMSCO Billing Servs., Inc.*, Nos. 96 C 226, 99 C 151, 2002 WL 34543515, at *4 (N.D. Ill. Dec. 5, 2002). *See also United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1167 (N.D. Ill. 2007) (refusing to dismiss a complaint that stated specific "facts regarding defendants' alleged off-label marketing," even without facts about specific claims).

As a former high-level executive of AIM, Dr. Nedza did not encounter claims documents submitted to the government by Defendant MA Plans and is not penalized for failing to plead such details more specifically. *United States ex rel. Sloan v. Waukegan Steel, LLC*, No. 15 C 458, 2018 WL 1087642, at *4 (N.D. Ill. Feb. 28, 2018); *United States ex rel. Litwiller v. Omnicare, Inc.*, No. 11-CV-8980, 2014 WL 1458443, at *10 (N.D. Ill. Apr. 14, 2014) (finding Rule 9(b) met where relator pled the structure of government payment generally). Relator was involved with the substance of AIM's procedures and policies governing the UM review process. SAC ¶ 16. Although she did not review specific pre-authorization requests, she is a well-placed insider whose information is more useful than, for example, a call-center worker who might have knowledge that a particular patient was denied a CT scan on a particular date. And the SAC provides sufficient detail to support her allegations of fraudulent conduct. For example, although Relator does not provide the names and dates of the 164 Medicare beneficiaries denied services during 2013, SAC ¶ 108, she pleads with more probative value that AIM's own Senior Medical Director Dr. Thomas Power concluded that 97.5% of those denials violated Medicare coverage rules. *Id.*

Admissions of fraud, even without specific examples, satisfy Rule 9(b). *Howard v. KBR, Inc.*, 139 F. Supp. 3d at 943 (denying a motion to dismiss an FCA complaint that did not plead "that any particular costs incurred by [Defendant] were unreasonable" because it pled defendant's admissions that costs were unreasonable); *United States v. R&F Properties of Lake Cty., Inc.*, 433 F.3d 1349, 1359–60 (11th Cir. 2005) (holding an FCA claim pled with the details of a billing scheme admitted by a manager for the defendant even without a single example). *See also United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 39 (1st Cir. 2017) (holding relator need not plead examples); *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015) (reversing dismissal of an FCA case against a corporation and 19 subsidiaries and rejecting the arguments that Rule 9(b) requires an FCA complaint to provide specific examples or specify employees by name for fraud allegations against a corporation); *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *2, 4-5 (11th Cir. Aug. 15, 2003) (holding an FCA claim pled with the details of a billing scheme, even where "she could not identify patient names nor the exact dates that the fraudulent claims were submitted").[14]

In a similar FCA case, *United States ex rel. Swoben v. United Healthcare Ins. Co.*, the defendant MA plans hired a subcontractor to manipulate medical diagnosis records through a review process purposefully rigged to violate MA rules and unfairly seek upward adjustments to capitation payments. 848 F.3d 1161, 1183 (9th Cir. 2016). The *Swoben* court observed that "the false claims [were] the allegedly false. . . certifications [of compliance], not the erroneously reported diagnosis codes." *Id.* Because the relator in *Swoben* pled details of the subcontractor's

---

[14] Also, Defendants obtained MA contracts by false statements, which makes every payment pursuant to those contracts false under the FCA regardless of any particular patient or pre-authorization request. *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005); *infra* Section IV.A.2.

fraudulent system, the relator was not required to identify patient examples or "identify specific diagnosis codes" that were false. *Id*

There are FCA cases where it may be an open question whether defendants submitted claims to the government, or whether the fraud impacted government claims, in which case examples of a specific false claim may be required. *See, e.g.*, *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 741–42 (7th Cir. 2007). This case is not one of them. As a result, the cases cited by Defendants are inapposite here, where the certainty of government payment is evident. In *United States ex rel. Keen v. Teva Pharm. USA Inc.*, No. 15 C 2309, 2017 WL 36447, at *4 (N.D. Ill. Jan. 4, 2017), for example, the court dismissed a complaint of off-label marketing because the allegations of claims made to the government, as opposed to private payors, were merely speculative. *Id.* at *4 n.3. *See also United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102 (7th Cir. 2014) (noting that customers who received kickbacks may not have been insured by Medicare or Medicaid); *United States ex rel. Lisitza v. Par Pharm. Cos.*, 276 F. Supp. 3d 779 (N.D. Ill. 2017) (granting summary judgment where relator, after discovery, still could not identify a single false claim); *United States ex rel. McGinnis v. OSF Healthcare Sys.*, No. 11-CV-1392, 2014 WL 2960344, at *8 (C.D. Ill. July 1, 2014) (concluding that the complaint suggested claims had not been submitted and were not false). In contrast, Defendants here perpetrated fraud exclusively on the government.

Defendants may dispute the *accuracy* of Relator's allegations that Defendants operated and utilized an unlawful review scheme that denied seniors medical care, but such disputes are questions of fact that have no bearing on a motion to dismiss. Even under Rule 9(b), the Court must take "the plaintiff's allegations as true and draw all reasonable inference in the plaintiff's favor." *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 704 (7th Cir. 2015).

2. Defendant MA Plans contracted with AIM and necessarily signed CMS contracts as participants in the Medicare Advantage program.

Defendants object that Relator does not provide more details about the MA contracts, such as the "date" or "signatory," MTD 153 at 3, but ignore that such details are not required. As the Seventh Circuit explained in *Leveski*, a relator satisfies Rule 9(b) if she pleads payment under a federal program that requires a contract or certification. 719 F.3d at 839. Relator sufficiently pleads that each Defendant MA Plan operated an MA insurance plan, and thus contracted with CMS as required by statute, and points to several material provisions of the contracts. SAC ¶¶ 4, 32, 156. The annual MA contracts are required and content is controlled by federal law, 42 U.S.C. § 1395w-27 ("no payment shall be made under [the MA program] … unless the Secretary has entered into a contract" with the MA plan) and 42 C.F.R. Part 422, Subpart K §§ 422.500-527, as implemented in CMS's template contract that tracks the statutory and regulatory provisions. *See* Exhibit 1, MA Contract.

Likewise, Defendants' demands for more detail about the AIM contracts are unavailing and unnecessary. Relator specifically pleads that each Defendant MA Plan contracted with Defendant AIM for the unlawful UM review process. SAC ¶¶ 6, 23, 46-47, 49-50, 83, 144. No Defendant MA Plan would (or could) delegate a major responsibility under the MA program to a separate entity, such as AIM, without a written contract that CMS requires. 42 C.F.R. § 422.504(i)(3) – (i)(4). The Seventh Circuit does not require more. *Leveski*, 719 F.3d at 838–39 (relator need not plead copies of contracts or certifications); *Lusby*, 570 F.3d at 853–54 (reversing dismissal of an FCA complaint for lack of specifics about documents).

"Rule 9(b) must not be read blindly, but instead should be applied in order to effectuate the purposes of the rule." *Petri v. Gatlin*, 997 F. Supp. 956, 975 (N.D. Ill. 1997). Relator pleads the existence of the pertinent contracts and presents allegations of fraud, built on Defendants'

admissions, and more, with sufficient detail to show that she has "some basis" and give the

Defendants the notice required by Rule 9(b).[15]

## IV.   Relator pleads each element of an actionable False Claims Act violation.

Relator pleads FCA violations predicated on the submission of *false claims* to the

government and making *false statements* to the government in connection with claims for

payment. No more is required. The text of the FCA states, in relevant part, that FCA liability

attaches to:

> (a) Liability for Certain Acts —
>> (1) In general — Subject to paragraph (2), any person who—
>>> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval
>>> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim

31 U.S.C. § 3729(a)(1) (2010). Accordingly, a cause of action for violation of this part of the

FCA has four elements:

> 1. A claim [31 U.S.C. § 3729(a)(1)(A)] or statement [31 U.S.C. § 3729(a)(1)(B)],
> 2. That is "false or fraudulent,"
> 3. Made "knowingly" (including with reckless indifference to falsity), and,
> 4. "Material" to payment.

*Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 (7th Cir. 2017).[16]

### A.   Relator sufficiently pleads false statements and false claims.

Defendants attempt to hide from the core falsity here, seeking to limit this fraud to a

---

[15] Relator satisfies Rule 9(b) in her allegations by demonstrating "some basis" for her allegations and providing proper notice. Though not necessary, she also explains the who, what, where, when, and how of the fraud with the role of each Defendant, *supra* Section III.C, how the fraud was perpetrated, *supra* Section II.A, for a fraud that spanned the country where Defendant MA Plans operate, based on falsities made annually and monthly. *Infra* Section IV.A.2.

[16] While the extent of financial harm Defendants cause may be an issue for remedies, loss to the United States is not an element of FCA liability. *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) (rejecting defendant's argument that the alleged fraud did "not lead to financial loss to the United States" as "a non-sequitur. The statute provides for penalties even if (indeed, *especially* if) actual loss is hard to quantify").

narrow category of FCA liability, and arguing for dismissal on technical defenses or alleged pleading infirmities. The FCA covers fraud, plain and simple. Although courts sometimes use labels of implied or express certification, factually or legally false, these "judicially-created formal categories. . . can also create artificial barriers that obscure and distort those requirements" of the FCA." *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 385–86 (1st Cir. 2011) (noting that the FCA does not refer to "certification" at all). *See also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1994, 2001 (2016) (rejecting the formalism of attaching dispositive significance to the label "express conditions of payment"). The FCA is written "'to reach all types of fraud, without qualification.'" *Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003).

Relator's "complaint was not required to include a legal theory." *Presser*, 836 at 784. Regardless, the SAC's allegations fit in to at least three judicially-recognized rubrics for FCA liability. They include:

(1) *False claims for nonconforming services.* Claiming payment for nonconforming or defective goods or services, or those not provided, is a classic false claim under the FCA. Defendants here claimed full payment from the government even though they provided deficient Medicare insurance coverage, and were effectively paid for medical services they refused to provide. As a result, their claims for payment were false. *See generally United States v. Bornstein*, 423 U.S. 303 (1976).

(2) *Fraudulent inducement*. Defendants also made (or caused to be made) fraudulent statements to obtain MA contracts (or extensions). This "fraudulent inducement" renders both the contract and all subsequent claims for payment under it "false or "fraudulent." *See generally United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542-44 (1943); *United States ex rel. Main v.*

*Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005).

(3) *Implied false certification.* Defendants' specific requests for MA payment were also false because they included a false implied certification of compliance with material contractual, statutory, and regulatory terms, both by failing to disclose material violations of Medicare rules and by making misleading half-truth representations about the services provided, just as in *Escobar*, 136 S. Ct. 1989.

An FCA complaint need only plead false claims or false statements, and can do so by pleading any one of these three bases (or others). Relator pleads Defendants' massive fraud on all three bases.

1. <u>Defendants submitted false claims for defective and nonconforming services.</u>

Defendants incorrectly contend that Relator fails to allege any "factually false" claim or "any claim for payment to the government that was ever submitted for services not provided." MTD 145 at 10. Indeed, that is the core of what Relator alleges. Defendants passed off defective and incomplete Medicare coverage as complete and compliant, and then fraudulently collected the full price for less medical care than the government purchased.

Since its passage, the FCA's purpose has been to deter and punish the provision of faulty goods or services to the government and the submission of inflated invoices. *United States v. Rivera*, 55 F.3d 703, 709–10 (1st Cir. 1995). A defendant who delivers a faulty product "not of the required quality" is liable under the FCA. *Bornstein*, 423 U.S. at 307. For example, a contractor who submits 87 octane gasoline on a contract that required 91 octane gasoline defrauds the government, even if the monthly invoice says nothing about the octane of the fuel and correctly lists the gallons provided. *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010) (illustrating a hypothetical false claim and holding "claims for nonconforming counseling and technical assistance were false").

26

Here too, Defendants fraudulently claimed payment for defective and nonconforming services. Specifically, CMS paid Defendant MA Plans to insure MA beneficiaries with coverage at least equal to traditional Medicare. Defendants contracted to provide Medicare insurance, including individualized determinations based on Medicare's coverage rules, that covered all Medicare services. *Humana Med. Plan, Inc. v. Western Heritage Ins. Co.*, 832 F.3d 1229, 1241 (11th Cir. 2016) ("section 1395w-22 requires a Medicare Advantage organization to provide the same benefits to enrollees" as traditional Medicare). "Persons who choose to enroll in MA Plans . . . must be provided with the same benefits that are available to those enrolled in traditional Medicare." *Meek-Horton v. Trover Sols, Inc.,* 915 F. Supp. 2d 486, 488 (S.D.N.Y. 2013).[17]

Instead, Defendants provided, or caused to be provided, faulty "Medicare" coverage that ignored Medicare's coverage rules and provided less care than is required. Defendants' defective and nonconforming MA coverage defrauded the government in the same way as the defendant who "palmed off [as compliant] … [medical] devices that materially deviated from the approved specifications," causing others to submit false claims for reimbursement to the government. *Nargol*, 865 F.3d at 40.

The fraud in this case is not simply about ancillary conditions, but rather goes to the very core of the government's contracts with Defendant MA Plans.[18]  CMS purchased for MA beneficiaries the full "basket" of Medicare services, and Defendants padded their profits by

---

[17] As CMS explicitly promises MA beneficiaries: "1. You're still in the Medicare Program; 2. You still have Medicare rights and protections; 3. You still get complete Part A and Part B coverage through the plan." Medicare.gov, 14 things to know about Medicare Advantage Plans, *available at* www.medicare.gov/sign-up-change-plans/medicare-health-plans/medicare-advantage-plans/things-to-know-medicare-advantage-plans.html (last visited May 31, 2018).

[18] Though, even ancillary requirements can support an FCA complaint. *United States ex rel. Upton v. Family Health Network, Inc.*, No. 09 C 6022, 2013 WL 791441 (N.D. Ill. Mar. 4, 2013) (finding FCA complaint sufficiently pled where a managed care plan violated rules governing discrimination in enrollment, even though every individual for which the plan billed the government received all required medical services); *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 724 (N.D. Ill. 2007) (same).

providing an incomplete "basket" of services while claiming the full contract price for tangibly

less coverage than CMS paid. This is little different then the doctor in Texas who defrauded

Medicaid by billing for complete Early Periodic Screening, Diagnosis, and Treatment screenings

of children when only performing incomplete screenings, *United States v. Mack*, No. CIV.H-98-

1488, 2000 WL 33993336, at *2 (S.D. Tex. May 16, 2000), or the company that charged the

government for full vials of prescription, when a patient only used partial vials, *Foglia v. Renal

Ventures Mgmt., LLC*, 754 F.3d 153, 158 (3d Cir. 2014). It makes no difference that CMS pays

MA plans capitated amounts in advance of the provision of the services, rather as reimbursement

after the services. The payment rate is set on the premise of full Medicare coverage; the

government overpaid.

The incomplete and nonconforming services Defendants provided are particularly

troubling because, in each instance, Defendants denied medical services that were requested, and

thus deemed reasonable and medically necessary, by the beneficiary's treating provider. SAC ¶

58. Defendants were not providing the government what it bargained for, and in providing less

than was required, Defendants endangered patients and defrauded the federal government.

2. <u>Defendants made false statements to fraudulently obtain MA contracts.</u>

Defendants wrongly contend that the SAC pleads, at best, breaches of contract—but not

fraud. "[F]ailure to honor one's promise is [just] a breach of contract, but making a promise that

one *intends* not to keep is fraud." *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d

914, 917 (7th Cir. 2005). Even Defendants concede that an FCA case can be premised on "facts

showing the supposed promise was false when it was made." MTD 153 at 10. That is fraudulent

inducement, which violates the FCA, and is precisely what Relator pleads.

In *Main*, the defendant university certified compliance with a wide range of federal

statutes and regulations to obtain access to federal subsidies, one of which prohibited the

28

university from paying recruiters contingent fees. *Id.* The initial certification was a lie because the university planned to and did pay the prohibited fees to recruiters. The Seventh Circuit found the FCA claim had been adequately pled because the defendant "'knew about the rule …, [and] told the [government] that it would comply, while planning to do otherwise." *Id.* at 917.

Similarly, Judge St. Eve held that a health care company had fraudulently induced capitated payments under Medicaid managed care contracts in *United States ex rel. Upton v. Family Health Network, Inc.*, No. 09 C 6022, 2013 WL 791441 (N.D. Ill. Mar. 4, 2013). In *Upton*, the defendant periodically certified that it accepted all enrollees regardless of medical history when it in fact excluded certain patients and lied about compliance "to keep the funding spigot open." *Id.* at *4. As a result, the court found those allegations to constitute "a chain of action" taken "to fraudulent[ly] induce future payments from and contracts with" the government, which sufficiently asserted "a fraudulent inducement theory." *Id.* Once a contract is obtained fraudulently, all subsequent payments under that contract are false claims. *Main*, 426 F.3d at 916; *United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 499–500 (8th Cir. 2016) (collecting cases).

As in *Main* and *Upton*, Relator alleges fraudulent inducement. To obtain MA contracts, and payment under those contracts, the Defendant MA Plans repeatedly and falsely represented to the government both that: (1) seniors enrolled in their MA Plans would receive, at a minimum, the same coverage as under traditional Medicare, and (2) coverage determinations would be made on an individualized basis using Medicare coverage rules. SAC ¶¶ 10, 149, 156, 157. All the while, Defendant MA Plans hired AIM to assist them in violating those very rules. Without their false statements to the government, "no Defendant MA Plan would receive a single payment under the MA program." SAC ¶ 156; 42 U.S.C. § 1935w-27(a).

a. <u>Defendants made false statements as Relator alleges.</u>

Though Defendants argue that the SAC insufficiently pleads the false statements underlying this fraud, in fact, Relator's allegations describe statements required by the government's regulatory structure pursuant to the Medicare program. SAC ¶¶ 32, 44, 156. Further details are unnecessary where the statements are dictated by statute and regulation. *Leveski*, 719 F.3d at 838–39.

Medicare Advantage's same benefits and individualized coverage determination rules are not only incorporated into every MA contract, 42 U.S.C. § 1395w-27(a), but are expressly "material to the performance of" those contracts. 42 C.F.R. § 422.504(a). Defendants thus pledge, repeatedly, to follow these Medicare rules. First, in the annual MA contracts with CMS, Exhibit 1, MA Contract at RESP0002-03, 06, each Defendant MA Plan certified:

- Operation "in compliance with the requirements of this contract and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.)."
- That the Plan provides "enrollees in each of its MA plans the basic benefits as required under 42 C.F.R. § 422.101."
- For "Beneficiary Protections," that the Plan complies "with all requirements in 42 C.F.R. O Part 422, Subpart M governing [individualized] coverage determinations."
- That all services will be provided "in a manner consistent with professionally recognized standards of health care."
- Use of "written protocols for utilization review and policies and procedures . . . in processing requests for initial or continued authorization of services and have in effect mechanisms to detect both underutilization and over utilization of services."

Second, on an annual basis, each Defendant MA Plan submitted a Bid and "Plan Benefit Package" that detailed the terms on which its MA Plan would operate. 42 C.F.R. § 422.254(a); Exhibit 1, MA Contract, RESP0002. That submission included a "Medicare Advantage Plan Attestation of Benefit Plan and Price," in which the MA Plan's CEO, CFO, or a direct-report designee re-certified, every year, that:

> I further attest that these benefits will be offered in accordance with all applicable Medicare program authorizing statutes and regulations and program guidance that CMS has issued to date and will issue . . . [including] the Medicare Prescription Drug Benefit Manual, the Medicare Managed Care Manual, and the CMS memoranda issued through the Health Plan Management System.

Exhibit 2, Benefit Attestation at RESP0031. Whether the falsity occurred in a contract or statement makes no difference: if it "is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims [Act] liability can attach." *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006).

In providing UM for Defendant MA Plans, AIM likewise agreed to comply with all "Medicare laws, regulations, and CMS instructions." 42 C.F.R. § 422.504(i)(4)(v); SAC ¶ 33. Nonetheless, Defendant MA Plans bear full responsibility not only for the falsity of their own certifications, whether reckless, knowing, or intentional, but also any falsity caused by Defendant AIM's actions. As a matter of law, "the MA organization is ultimately responsible for ensuring that the [delegated] entity … satisfies the relevant requirements." 42 C.F.R. 422.562(a)(3); 42 C.F.R. § 422.504(i). *See also* Exhibit 1, MA Contract at RESP0010.

These repeated statements of compliance were false because, by hiring AIM, Defendants violated Medicare's same benefits rule and individualized determinations requirement for coverage decisions. Defendants did not provide full Medicare coverage of all required Medicare services. *Supra* Section II.A. Defendants' coverage decisions were not made through individual determinations, but rather a rigged process in which AIM (1) refused to approve requests solely to hit contractual denial targets, irrespective of any individual medical condition or circumstance; (2) denied requests for slow responses (regardless of medical merits);(3) limited contact with medical providers; (4) arbitrarily and secretly refused to consider any medical information not in the first 10 pages of a fax (because they set the fax machine to stop printing after 10 pages); (5)

applied arbitrary rules with no basis in Medicare policy to deny requests regardless of individual circumstances, such as the rule against scanning adjacent body parts; and (6) systematically ignored the mandatory Medicare coverage policies.

The SAC thus alleges false statements based on the Medicare statute, regulations, the associated CMS documents, and Relator's personal knowledge. As a former employee of AIM, who had and has no access to the specific contract documents of the Defendant MA Plans, no more is required. *Leveski*, 719 F.3d at 838-39.

> b. Defendants' statements were false at the time they were made.

"[T]he core of the inducement theory [of FCA liability] is that the pretense of compliance—past, present and future—with respect to earlier contracts serves to induce later contracts, by falsely representing intent to comply." *Upton*, 2013 WL 791441 at \*7 (finding fraudulent inducement where defendant certified compliance "while knowing it had been and would continue" to violate the rules). Similarly, periodic certifications of compliance with "non-discrimination" rules established the fraudulent inducement of a Medicaid managed care contracts in *Tyson*, 488 F. Supp. 2d at 725-26. There, the defendant "knew when it signed the 2000 [Managed Care Organization] Contract with the [state] that discriminatory marketing practices were forbidden," but had been doing so and planned to continue anyway. *Id.* at 725 (entering judgment of $334 million).

Here, as Relator alleges: "Defendant [MA] Plans' certifications were knowingly and intentionally false," because "even after using the AIM UM review process, Defendant [MA] Plans continued the false certifications to CMS." SAC ¶ 157. "Defendants falsely certified that they would follow all Medicare rules in determining what care Medicare beneficiaries would receive, all the while knowing that they were using an unlawful scheme of pre-authorization." SAC ¶ 10. Without the false statements, "no Defendant [MA] Plan would receive a single

payment under the MA program." SAC ¶ 156. Accordingly, Defendants' false statements in contracting and payments claimed under the contracts violated the FCA. *Main*, 426 F.3d at 916. The SAC does not plead a mere breach of contract; instead, it pleads classic fraud.

### 3. Defendants also made or caused to be made false or fraudulent requests for payment to CMS that falsely represented material compliance under *Escobar*.

As a third and independently sufficient basis for FCA liability, Relator pleads that Defendants violated the FCA because their requests for payment implicitly and falsely certified compliance with material Medicare rules and Defendants' own MA contracts. "[A] defendant [who] submits a claim" for payment to the government "impliedly certifies compliance with all conditions of payment." *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995 (2016). The failure to disclose the "violation of a material statutory, regulatory, or contractual requirement" constitutes a misrepresentation that renders the claim false or fraudulent under the FCA. *Id.* As identified above, Defendants continually violated at least two foundational Medicare rules, which were statutory, regulatory and contractual requirements, yet continually claimed full payment from CMS while implying that they were providing the Medicare insurance CMS had purchased. No doubt these fundamental rules were material and violations not disclosed. *See infra* Section IV.C.

Defendants incorrectly contend that *Escobar* permits only a narrow set of implied certification claims. The Court in *Escobar* validated the implied certification theory generally, but expressly declined to establish its limits and reserved the question of "whether all claims for payment implicitly represent that the billing party is legally entitled to payment." 136 S. Ct. at 2000. *See also United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 and n.3 (4th Cir. 2017) (recognizing that *Escobar* did not set a limit on implied certification and finding fraud in billing for a security guard who did not meet the qualifications set in a contract).

The Court in *Escobar* simply identified one way an implied certification can establish FCA liability, namely, "at least" when (1) the claim for payment makes specific representations about the goods or services provided, and (2) the failure to disclose material noncompliance makes those representations misleading half-truths. 136 S. Ct. at 2001. Regardless of the limits of implied certification claims, Relator's allegations fall squarely within these two parameters and align with the facts of *Escobar*.

As in *Escobar*, Defendants submitted claims for payment by reference to specific numeric codes, necessary to calculate and collect the payment, that corresponded with the content and quality of services allegedly provided. In *Escobar*, the defendant submitted claims using payment codes that reflected specific counseling services and provider identification numbers that corresponded to job titles with specific state licensing requirements. Even without more, the claim implicitly represented that the therapy and counseling services had been administered by qualified counselors, when, in fact they had not because the company had violated state licensing requirements. 136 S. Ct. at 2000.

Similarly, to collect monthly capitation payments, each Defendant MA Plan submitted a payment request by reference to a specific MA plan identification number, necessary to calculate and collect payment, in which the Plan warranted that it served the listed number of Medicare enrollees. The plan identification number corresponded to the plan's annual MA bid submission, which listed the benefits the Plan would provide and calculated the monthly cost of providing all Medicare benefits to a plan enrollee.[19] *See* 42 C.F.R. §§ 422.252, 422.254(b)(1)(i). Without more, the Defendant MA Plans' claims implicitly represented, falsely, that each enrollee for

---

[19] Plans cannot provide *less* than Medicare's basic benefits—those covered under traditional Medicare—but can contract with CMS to provide more.

whom the Plan was claiming a capitated payment received the services outlined and promised in

its bid submission (which includes all Medicare services).

The payment request document includes: (a) the plan identification number

(corresponding to the package of services promised in the Plan's annual bid submission); (b)

enrollment count of individuals who received the Plan's services for the month; and (c) a

certification that:

> each enrollee for whom the organization is requesting payment is validly enrolled in an MA
> plan offered by the organization and the information relied upon by CMS in determining
> payment (based on best knowledge, information, and belief) is accurate, complete, and
> truthful.

42 C.F.R. § 422.504(l)(1). *See* Exhibit 1, MA Contract at RESP0026, Attachment A.[20] These

certifications with the "requests for payment under the [MA] contract," are explicitly designated

as "a condition for receiving a monthly [MA] payment." 42 C.F.R. § 422.504(l). Likewise, the

annual bid submission to which the payment request refers again included Defendants'

certification that they provide *all* Medicare benefits, comply with Medicare rules, and provide

the benefits list in the Plan's bid package. 42 C.F.R. § 422.504(l)(4); Exhibit 1, MA Contract at

RESP0002; Exhibit 2, Benefit Attestation. The monthly data and annual bid submissions are not

only conditions of payment, but also are used by CMS to calculate the amount of the capitation

payment.[21] Thus, Defendant MA Plans' requests by reference to a plan identification number

---

[20] Defendant MA Plans similarly submitted monthly risk adjustment data—demographic and diagnosis information
for each enrollee of the plan—which CMS uses in conjunction with the Plan's annual bid to calculate the capitation
payment. *See* Exhibit 1, MA Contract at RESP0027, Attachment B; CMS, Medicare Managed Care Manual, Chapter
7 – Risk Adjustment (September 19, 2014), *available at*, www.cms.gov/Regulations-and-
Guidance/Guidance/Manuals/Downloads/mc86c07.pdf  (last visited May 31, 2018). On this form, too, the
Defendants requested payment by the same plan identification number (linked to a specific annual bid and MA
contract), acknowledged that the data directly affects CMS payments, and certified that the data is complete,
truthful, and accurate. *See* 42 C.F.R. § 422.504(l)(2); Exhibit 1, MA Contract at RESP0027, Attachment B.

[21] While monthly capitation payments do not vary with the amount of services provided, MA plans receive different
monthly amounts. The plan identification number was a claim to the payment level associated with that plan (based
on location, costs, quality, demographics and other factors).

represented both the services provided and claimed capitation payments in the specific amounts linked to that Plan.

Defendants' silence with the monthly claims could only lead CMS to assume that they were complying with their material Medicare obligations, just as the defendant's silence in *Escobar* led the government assume that the counseling not only had been provided (the session occurred), but that the therapist who completed it was licensed.

Moreover, to the extent the Supreme Court left undefined what type of "specific representation about the goods and services provided" can support an impliedly false certification, the remedial purpose of the FCA "supports a broad interpretation." *See United States ex rel. Heath v. Wisconsin Bell, Inc.*, 111 F. Supp. 3d 923, 926–27 (E.D. Wis. 2015). Accepting Defendants' arguments here would "allow [managed care organizations] to fraudulently obtain funds made available by the federal government, a result contrary to what Congress intended," *id.*, and fail to "protect the funds and property of the Government from fraudulent claims*," Rainwater v. United States*, 356 U.S. 590, 592 (1958). Relator pleads an FCA claim for the implicitly false payment requests under *Escobar*.

    4.  <u>Defendants' additional arguments are likewise misconceived and unavailing.</u>

Defendants' further contentions do not undermine the simple and clear false statements and claims used in this fraud, nor permit them to escape FCA liability.

    a.  <u>This case is about fraud, not good faith differences in professional judgment.</u>

Defendants assert that this case is only about contestable professional judgments of medical necessity, rather than "objective falsity" or fraud. MTD 145 at 18-19. That is wrong. This case is about intentional, dangerous, and dishonest fraud. First, the SAC demonstrates that Defendants knew their practices were unlawful. Choosing to violate the law is not an honest exercise of professional judgment, it is fraud. *United States ex rel. Howard v. KBR, Inc.*, 139 F.

Supp. 3d 917, 943 (C.D. Ill. 2015) (finding fraud alleged over violation of a contestable standard, based on an admission). Second, even if Defendants had justifiable disagreements with Medicare's coverage rules, they were bound by and pledged to follow them. Third, the fact that medicine is a profession, and medical decisions can be informed by judgments, does not confer FCA immunity. *See, e.g.*, *United States ex rel. Roberts v. Lutheran Hosp.*, No. CIV. 97-CV-174, 1998 WL 1753335, at *10 (N.D. Ind. Apr. 17, 1998) (rejecting the asserted defense that medical care turns on subjective "professional judgments" and thus cannot support an FCA claim); *United States ex rel. Youn v. Sklar*, 273 F. Supp. 3d 889, 897-98 (N.D. Ill. 2017) (rejecting medical judgment defense because CMS "decide[s] what types of treatment will be covered").[22] Fourth, the very premise of Defendants' position, that they should be protected in their exercise of medical judgment, ignores the gravamen of the complaint: Relator alleges Defendants' refusal to exercise medical judgment, not flawed medical judgment.[23] For example, when AIM turned off its algorithms to categorically refuse pre-authorization and raise denial rates, it was not acting pursuant to medical judgment, but rather greed and wanton violation of the law. *Supra* Section II.A. Fifth, Defendants concealed their fraud by falsely telling beneficiaries that the wrongful denials were based on Medicare policy and falsely quoting the AIM Guidelines as Medicare policy. SAC ¶¶ 93-94. Concealment is further indicative of fraud. *Howard*, 139 F. Supp. 3d at 943 (concealment of information from the government permits a finding that the statement was "objectively false").

---

[22] To the extent Defendants demand more context for "why [defendant's] alleged actions" violated the statute, MTD 145 at 20, the Seventh Circuit has long rejected any requirement that relator plead facts to explain why the statement was false. *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779–80 (7th Cir. 2016). Regardless, Dr. Nedza pleads that Defendants themselves concluded the denials were false and admitted so no more is required.

[23] Even as to allegations about the substance of AIM's denial rules, Dr. Nedza alleges violation of CMS's binding medical judgments, such as NCDs and LCDs, which Defendant must follow. SAC ¶¶ 82, 85, 90.

        b.  <u>This case is about fraud, not about good faith disputes about how to best interpret technical regulations.</u>

Defendants try to reduce this case to a dispute about the technical interpretation of Medicare coverage rules (such as NCDs and LCDs), which they mischaracterize as "nonbinding guidance" and erroneously contend cannot form the basis of an FCA violation. *See* MTD 160 at 2, n.1; MTD 150 at 6; MTD 145 at 18. Relator's allegations are about fraud and the denial of care with no medical basis. She alleges not that Defendants misinterpreted the Medicare coverage rules, but rather that they systematically ignored them, and that coverage was denied through numerous arbitrary protocols, practices, and rules unrelated to medical need. SAC ¶¶ 9, 60-105. [24]

Defendants contracted and pledged to follow CMS coverage rules, including the NCDs and LCDs that are binding on Defendants, and cannot choose to disregard those rules in favor of profits. *Supra* Section IV.A.2; 42 C.F.R. § 422.101(b). *See United States ex rel. Youn v. Sklar*, 273 F. Supp. 3d 889, 897 (N.D. Ill. 2017) (non-compliance with LCD can give rise to FCA liability); *United States v. Kinetic Concepts, Inc.*, No. 08-cv-01885, 2017 WL 2713730, at *7–8 (C.D. Cal. Mar. 6, 2017) (holding that LCDs are binding); *Druding v. Care Alternatives, Inc.*, 164 F. Supp. 3d 621, 629–30 (D.N.J. 2016) (same); *United States ex rel. Ryan v. Lederman*, No. 04-CV-2483, 2014 WL 1910096, at *4–5 (E.D.N.Y. May 13, 2014) (same).

---

[24] Nor do the cases Defendants cite about technical violations undermine the SAC. In *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019-20 (7th Cir. 1999), the court affirmed summary judgment for defendant where relator complained merely about imperfect implementation of the City's new bus routes, but the City was actively working with the federal government to address any concerns about technical compliance and there was no basis to infer fraud. In *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005), the court simply held that violation of the Anti-Kickback Statute can support an FCA claim, including in "falsely certifying [compliance] on a Medicare enrollment form."

    c.  <u>This case is about fraud in violation of core Medicare statutes and regulations, not just the "Medicare Managed Care Manual."</u>

Defendants wrongly contend that "Relator relies entirely on the Medicare Managed Care Manual" for her allegations, which they assert cannot support an FCA claim. MTD 145 at 16-17; *see also* MTD 153 at 8-9. First, Relator alleges violation of Medicare statutes and regulations, including Medicare's same benefits and individual determination rules. *See*, *e.g.*, SAC ¶¶ 35-37, 39. Second, Defendants specifically certified their compliance with the Medicare Manuals. *Supra* Section IV.A.2. False pledges to comply with the Medicare Manuals, or any other non-regulatory term in a contract, are false statements under the FCA.

Defendants' footnote citation to internal "Department of Justice policy," MTD 145 at 18 n.9 (citing Brand memo), does not suggest a contrary result or serve as binding authority for this Court. *See Main*, 426 F.3d at 917 (rejecting defendant's reliance on "a back-office memo" that "has no legal effect"). Further, the document, even in substance, does not undermine this FCA case based on violations of the Medicare statute, regulations, and false statements made in contracting with CMS and seeking payment. A fraudulent misrepresentation with respect to a contract violation undisputedly gives rise to FCA liability. *See, e.g., Escobar*, 136 S. Ct. at 2001.

In any event, the Medicare Manuals derive from and explain Medicare regulations and statutes. Defendants must comply with Medicare statutes and regulations, as interpreted by CMS through the Medicare Manuals, and Defendants promised to do so. An agency's interpretation of its own regulations is given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 644–45 (7th Cir. 2016) (relying on a Medicare Manual to interpret Medicare regulations).

Finally, Defendants wrongly assert that the certifications in this case are too broad to support an FCA claim. Defendants, however, rely on case law that concerns FCA claims

premised on mere technicalities. In contrast, the instant case concerns the most fundamental aspect of Medicare Advantage, that coverage is the same or better than that delivered by traditional Medicare. This is not a mere technicality. Indeed, Defendant MA Plans' false statements refer directly to the same benefits and individualized determination rules, not just Medicare rules in general. Exhibit 1, MA Contract at RESP0002-03, 06. *See also United States ex rel. Cieszyski v. LifeWatch Servs., Inc.*, No. 13-CV-4052, 2015 WL 6153937, at *8 (N.D. Ill. Oct. 19, 2015) ("[t]he Seventh Circuit has held that a promise . . . to abide *by all Medicare and Medicaid laws and regulations*—is specific enough to support an express false certification theory of liability."). After *Escobar*, any concern about alleged "technicalities" is evaluated pursuant to the materiality inquiry. *Infra* Section IV.C.

B. Relator pleads sufficient facts to infer that Defendants acted with at least reckless disregard.

Contrary to Defendants' protestations, Relator alleges facts—from admissions to systemic and carefully considered business practices—sufficient to infer that each Defendant acted with at least reckless disregard as to the falsities submitted in this scheme. Under the FCA, liability for "knowing" conduct includes acting with "deliberate ignorance" or "in reckless disregard of the truth." 31 U.S.C. § 3729(b)(1)(A). The Seventh Circuit has explained that "reckless disregard" includes defendants who (a) failed "to make [a reasonable] inquiry;" (b) had "reason to know of facts that would lead a reasonable person to realize" the falsity; or (c) were "grossly negligent" toward the falsity. *United States v. King-Vassel*, 728 F.3d 707, 712–13 (7th Cir. 2013) (citations omitted). The FCA does not require "specific intent to defraud," 31 U.S.C. § 3729(b)(1)(B), nor does Rule 9(b) require pleading "knowledge" (i.e. recklessness) with particularity. Thus, a relator need only "plead facts making it more than a sheer possibility that [defendant] acted with knowledge;" she does not need "a particularly *good* case, only to state a

plausible case." *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 263 (5th Cir. 2014). Relator easily pleads that the Defendants acted with at least reckless disregard.

      1.   <u>AIM's fraud was admitted by its executives.</u>

AIM executives repeatedly admitted that the violations of Medicare requirements (and, thus, causing the submission of false statements and claims) was an intentional choice of profits over compliance. *See* SAC ¶¶ 110-118, 129-130, 141. *Presser*, 836 F.3d at 781, n.29 (noting that knowledge was adequately pled based on the statement of defendant confirming the fraudulent practice).[25]

      2.   <u>Anthem acted with intent as revealed by its actions and own executive.</u>

AIM and Anthem executives openly discussed the fraud scheme. *See, e.g.*, SAC ¶¶ 91, 133. Anthem knew so much about the unlawful scheme that it withdrew its MA plans—for a time—from AIM's UM review. SAC ¶ 137. Even Anthem's Vice President Dr. Alan Rosenberg warned Anthem about the fraud. SAC ¶ 134. *See United States ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 12-CV-10601, 2018 WL 1996829, at *6 (D. Mass. Apr. 27, 2018) (finding knowledge pled where defendant's executives questioned the lawfulness of the fraud).

      3.   <u>Defendant MA Plans were *at least* reckless based on the excessive denial rates they purchased, information they were given, and responsibility for AIM.</u>

Relator alleges a constellation of facts, far more than just the allegation that each is a "'sophisticated, multiregional business,'" MTD 145 at 14, which show Defendant MA Plans had at a minimum reason to know of or failed to inquire about the falsities they submitted to CMS, to inflate their own profits, especially given their ultimate responsibility for AIM's actions.

---

[25] AIM and Anthem violate the FCA by knowingly causing Defendant MA Plans to submit false statements and claims to the government, regardless of the Plans' scienter. *See, e.g.*, *Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 738 (N.D. Ill. 2010) (a "wealth of case law supports the proposition that the FCA reaches claims that are rendered false by one party, but submitted [innocently] to the government by another").

Medicare regulations dictate that each MA plan "maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract," even when subcontracting. 42 C.F.R. § 422.504(i)(1); SAC ¶ 33. Defendant MA Plans must operate extensive integrity programs with audits, corrective actions, and self-reporting to "prevent, detect, and correct non-compliance with CMS program requirements." 42 C.F.R. § 422.503(b)(4). The monitoring required for "utilization management [sub-contractors] … may be more or less continuous." CMS, Medicare Managed Care Manual, Chapter 11 – Medicare Advantage Application Procedures and Contract Requirements, § 11.110.2 (April 25, 2007).[26]

Accordingly, MA plans violate the FCA when they do not "make such inquiry as would be reasonable" about the falsity of suspicious data. For example, a relator sufficiently alleged fraud by an MA plan that merely passed along false diagnoses from a medical provider to CMS; the rate of severe diagnoses was so high that the MA plan was plausibly reckless. *Graves v. Plaza Med. Centers, Corp.* No. 1:10-cv-23382, 2015 WL 11199839, at *8 (S.D. Fla. Apr. 1, 2015) (relying on the Second Amended Complaint, ECF No. 102, ¶ 29). In *Graves,* the MA plan "would have detected [the fraud had it] conducted its audits in conformity with Medicare requirements;" instead the plan ignored the fraud to collect inflated MA payments. *Id.*

Against this regulatory backdrop, Relator raises a plausible inference that Defendant MA Plans were at least reckless. They all purchased not just "higher than average" denial rates, MTD 153 at 2, MTD 150 at 5, but denial rates more than five times that available under Medicare rules. SAC ¶¶ 7, 46. Defendant MA Plans all (1) received extensive data every month about AIM's denials, broken down by medical service, SAC ¶ 147; (2) were required to scrutinize, at least annually, their utilization of medical services through actuarial studies, 42 C.F.R. §

---

[26] *Available at,* www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c11.pdf (last visited May 31, 2018).

422.254(b)(5) and § 422.256(b) (requiring actuarial certifications of the MA plans benefits based on utilization), (3) signed contracts that promised specific denials and cost savings (4) signed contracts that stated AIM was not reviewing requests based on Medicare coverage rules, SAC ¶¶ 83, 144; and (5) chose AIM's unlawful UM review process over other more compliant review products that AIM offered, SAC ¶¶ 128-129. In addition to their regulatory obligations, Defendant MA Plans discussed Medicare compliance with AIM directly. *See, e.g.*, SAC ¶¶ 144 (objections of a plan's compliance team), 145 (ignoring Medicare rules), 146 (proposed confession to CMS).

As in *Graves*, the SAC plausibly pleads that Defendant MA Plans were at least reckless to the falsity of their statements to CMS and claims for MA payments. Any Defendant MA Plan that purports to be ignorant lied to CMS twice: first, about compliance with Medicare coverage and determination rules, and second, about its monitoring program. Defendant MA Plans cannot recklessly perpetuate fraud, keep the profits of the scheme, and escape liability: one who bills Medicare is "held to the most demanding standards in its quest for public funds." *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 63 (1984).

C.  Relator sufficiently pleads the materiality of Defendants' fraud.

Relator agrees that FCA liability does not attach to frauds arising from merely minor or insubstantial—i.e., immaterial— violations of statutory, regulatory, or contractual requirements. 31 U.S.C. §§ 3729(a)(1)(B) (requiring materiality) and (b)(4) (defining materiality). But that is not the case here where the violations at issue are far from minor, insubstantial, or obscure. As noted above, the Defendants' fraud goes to the heart of the bargain between the government and every MA plan. In return for allowing private entities to offer MA plans, the federal government requires that they guarantee Medicare beneficiaries at least the same level of benefits, and make individualized coverage determinations using the same standards, as traditional Medicare. These

43

requirements are fundamental to the statutory, contractual and regulatory framework governing the MA program. And, they exist, at least in part, to prevent the kind of opportunistic practices seen here where Defendants knowingly compromise MA coverage in order to maximize their profits.

The leading case on FCA materiality is the Supreme Court's recent decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, where the Supreme Court emphasized that frauds and violations that go "to the very essence of the bargain" are presumptively material. 136 S. Ct. 1989, 2003 n.5 (2016) (quoting *Junius Constr. Co. v. Cohen*, 178 N.E. 672, 674 (1931)). Just so, here. This fraud goes to the very basis of the MA program and the conditions Congress imposed for MA plans to exist at all: they cannot cheat seniors or reduce their Medicare benefits. These rules are so essential that they are repeated throughout the Medicare statutes, regulations, MA contracts, and benefit attestations, and are expressly designated as "material." *Supra* Section IV.A.2. Defendants' choice to brief materiality at length is, therefore, surprising—especially considering three additional factors that they also ignore.

First, the SAC pleads a higher level of materiality than the law requires. The test for FCA materiality is objective: for purposes of the FCA "the term 'material' means having a natural tendency to influence, or be capable of influencing" government payment decisions. 31 U.S.C. §3729 (b)(4); *Escobar*, 136 S. Ct. at 2002–03. Here, the SAC alleges not merely that the fraud would have a "tendency to influence" payment decisions, but that it *would* have influenced government payment. SAC ¶¶ 165, 169. *See generally United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (noting that materiality does not ask whether the government "was sure to enforce the statute" but merely whether the falsity "could have influenced the agency's decision" and that "laws against fraud protect the gullible and the careless—perhaps *especial*ly the gullible

44

and the careless—and could not serve that function if proof of materiality depended on establishing that the recipient of the [false or fraudulent] statement would have protected [its] own interests").

Second, in many FCA cases at the motion to dismiss stage, there is scarce, if any, available direct evidence of materiality—because the government has never spoken to the issue. Here, by contrast, the government has publicly highlighted the materiality of the Defendants' violations. The government consistently and emphatically reassures seniors that MA plans cannot and will not do what the Defendants are doing, i.e. compromising their coverage. The government's statements strongly support the SAC's allegations of materiality, and lift them far above the requisite threshold of plausibility.[27]

Third, Defendants' materiality arguments also ignore allegations in the SAC that Defendants themselves believe their violations were material. As alleged in the SAC, Defendants' internal documents and discussions are replete with admissions of "compliance risk," SAC ¶¶ 110, 129, 141, and 144, concerns about being "caught by CMS," SAC ¶ 141, and expression of fear that AIM's utilization review practices would lead to criminal prosecution and jail, SAC ¶¶ 115 and 146. Indeed, Anthem was so concerned about how the government would respond that it pulled the Anthem MA Plans out of AIM's UM review process for a period. SAC ¶ 137. These allegations provide strong evidence not only that Defendants' violations were material but also that the Defendants knew they were material.

---

[27] *See, e.g.*, Medicare.gov, How do Medicare Advantage Plans work?, *available at*, www.medicare.gov/sign-up-change-plans/medicare-health-plans/medicare-advantage-plans/how-medicare-advantage-plans-work.html ("Medicare Advantage Plans cover all Medicare services" and "[t]hese companies must follow rules set by Medicare."); Medicare.gov, 14 things to know about Medicare Advantage Plans ("1. You're still in the Medicare Program; 2. You still have Medicare rights and protections; 3. You still get complete Part A and Part B coverage through the plan."), *available at* www.medicare.gov/sign-up-change-plans/medicare-health-plans/medicare-advantage-plans/things-to-know-medicare-advantage-plans.html; Medicare.gov, What's a Medicare Advantage Plan? ("Medicare Advantage Plans must cover all of the services that Original Medicare covers except hospice care."), *available at* www.medicare.gov/Pubs/pdf/11474.pdf (all last visited May 31, 2018).

Defendants ignore the important factors noted above and instead suggest that one factor by itself should be dispositive of materiality in FCA cases. Specifically, Defendants contend that the government's continued payment once it learns of the fraud allegations demonstrate that the allegations are not material. The Defendants, however, do not correctly articulate the law.

First, the Supreme Court rejected that contention in *Escobar*, explaining that even when the government pays a claim in full, that continued payment may be "evidence" (sometimes even "strong" evidence) that there has been no material fraud, but continued payment is not dispositive. 136 S. Ct. at 2003–04. *Escobar* is explicit: materiality cannot rest on "'a single fact or occurrence as always determinative.'" *Id.* at 2001 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)). *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109–10 (1st Cir. 2016) (materiality is a "holistic" inquiry). The Supreme Court did not say in *Escobar* that continued payment defeats materiality per se. It rejected that position, which requires this Court to reject it too.[28]

Second*, Escobar* instructs that continued payment is only relevant when the government pays "despite its actual knowledge," not just of allegations of fraud (including in a civil complaint), but "actual knowledge" of the veracity of those allegations. See 136 S. Ct. at 2003-

---

[28] This court's decision in *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058 (N.D. Ill. 2016), on which the Defendants rely, is completely distinguishable. In that case, the court dismissed a complaint filed by the City of Chicago, without prejudice, for the City to add allegations explaining how it could allege a *continuing* fraud even after it filed a lawsuit claiming knowledge of the true facts. *See id.* at 1079 ("the Court has difficulty understanding how the City remained unaware that the claims were false *after the lawsuit was filed*") (emphasis added). That rationale does not apply here, where the plaintiff is a relator, not the government. As case law makes clear, a relator's *allegations* are an insufficient basis for imputing the requisite *knowledge* to the *government.* Payment with actual knowledge of the fraud may be germane to materiality; payment with *notice* of allegation of fraud is not. *See United States ex rel. Escobar v. United Health Servs., Inc.*, 842 F.3d at 112 ("mere awareness of allegations concerning noncompliance . . . is different from knowledge of actual noncompliance"); *United States. ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 906 (9th Cir. 2017) (cautioning against "read[ing] too much into" a government agency's continued payment); *United States ex rel. Brown v. Pfizer, Inc*., No. CV 05-6795, 2017 WL 1344365, at *11 (E.D. Pa. Apr. 12, 2017) ("mere knowledge of allegations regarding noncompliance is insufficient to prove actual knowledge of noncompliance'"").

04 (twice emphasizing the requirement of "actual knowledge"). *See also Escobar*, 842 F.3d at 112 ("mere awareness of allegations concerning noncompliance . . . is different from knowledge of actual noncompliance"). There is no stipulation or showing of the government's "actual knowledge" here, and it cannot be imputed to the government at the pleadings stage.[29]

Third*,* to conclude as a matter of law that materiality turns on whether the government has terminated payments by the pleading stage of an FCA case would ignore that the government frequently pays for healthcare services and then investigates or prosecutes fraud only after the fact, or relies on FCA actions. The government may have limited resources or concern for the cost of terminating payments, including possible harm to patients. The government's continued payment does not mean that the government has investigated and refuted a relator's fraud allegations, or that it does not care. Nothing in the FCA or *Escobar* requires a showing that the government has terminated payments to satisfy materiality. As the United States Department of Justice has emphasized, such a result would be absurd. More than 600 *qui tam* actions were filed in Fiscal Year 2017. It is simply not feasible for "Government agencies [to] be expected to stop payment each time a qui tam is filed …." Brief of the United States Opposing a Motion to Dismiss at 13, n.5, *United States ex rel. Poehling v. UnitedHealth Group, Inc., et al.*, (C.D. Cal. Jan. 29, 2018) (No. 2:16-cv-08967), 2018 WL 549781. If the government concludes, at any point, that an alleged fraud is immaterial, the Government knows how to protect itself, including by seeking a dismissal. 31 U.S.C. § 3730 (c)(2)(A). The filing of an FCA complaint does not give a defendant a shield against liability for fraud.

---

[29] The limited audits conducted by CMS of a handful of patient files, on which the Defendants rely, also provide no basis for concluding, as a matter of law, that the government continues to make payments "despite actual knowledge." *See infra* Section V.A. Likewise, Defendants' unsupported conjecture that the government "could" have noticed the fraud earlier from risk adjustment data, MTD 145 at 25, is not a cognizable argument under Rule 12(b)(6).

**V.    Defendants' other arguments are meritless.**

   A.    Relator's allegations are not parasitic or publicly disclosed by CMS audits.

Defendants' remarkable assertion that the SAC "relies *entirely* on publicly available information," MTD 150 at 2 (emphasis added), is utterly false. It ignores the fact that Dr. Nedza was a high-level AIM executive whose allegations are based on her personal observations and insider information. This is far from a "parasitic lawsuit[] by [an] 'opportunistic plaintiff[] who ha[s] no significant information to contribute of [her] own.'" *Bellevue*, 867 F.3d at 716. Defendants assert a "public disclosure," but tellingly refuse to provide even one of the documents that they state are dispositive. Defendants' gross overstatements are not a legitimate basis for its public disclosure argument.

To prevent "unnecessary 'me too' private litigation," the FCA prohibits cases if "substantially similar" allegations have been made public. *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 934 (7th Cir. 2012). Accordingly, a relator may not bring an FCA suit where (1) a statutorily-enumerated source previously "publicly disclosed," (2) "substantially the same allegations or transactions" as the complaint, unless (3) the relator is an "original source" of the allegations. 31 U.S.C. § 3730 (e)(4)(2010).[30] The Seventh Circuit has "indicated on more than one occasion that viewing FCA claims 'at the highest level of generality . . . in order to wipe out *qui tam* suits that rest on genuinely new and material information is not sound.'" *Leveski*, 719 F.3d at 829 (quoting *Goldberg*). That bar has no application here.

---

[30] Prior to the FCA amendments that were effective March 23, 2010, the FCA barred cases "based upon" a public disclosure, rather than "substantially the same" as a public disclosure. In the Seventh Circuit, that amendment did not substantively change the public disclosure bar because the Seventh Circuit had already interpreted the FCA's prior language of "based upon" to mean "substantially similar." *Bellevue*, 867 F.3d at 717-18. Thus, as to all time periods in this lawsuit, the public disclosure question is whether "substantially the same allegations" were already disclosed. After the 2010 amendments, however, the public disclosure bar is no longer jurisdictional. *Compare* 31 U.S.C. § 3730(e)(4)(A) (2009) ("No court shall have jurisdiction…"), *with* 31 U.S.C. § 3730(e)(4) (2010) ("The court shall dismiss…").

1.  <u>Defendants fail to articulate the alleged public disclosure at issue.</u>

Defendants' public disclosure argument cannot succeed without their stating the actual disclosure that is at issue. Their refusal to do so here not only undermines their argument, but also indicates that the CMS audits on which they rely were not disqualifying disclosures. In the cases Defendants cite in support of their public disclosure argument, the actual document alleged to be a public disclosure was before the court.[31] Defendants' failure to provide the very documents they argue are dispositive is fatal. *United States ex rel. Gagne v. City of Worcester*, No. CIV.A. 06-40241, 2008 WL 2510143, at \*3–4 (D. Mass. June 20, 2008), *aff'd,* 565 F.3d 40 (1st Cir. 2009) (refusing to dismiss an FCA complaint because "defendants have provided no actual evidence" of the alleged public disclosure). Defendants simply provide no basis for the Court to evaluate any purported "public disclosure" or dismiss the SAC.

Further, from the SAC alone, it is apparent that Relator does much more than "add a few allegations" and "re-package" any prior reports. *Leveski*, 719 F.3d at 833. The SAC merely mentions prior CMS audits that (1) found two Defendants failed, on at least one occasion, to make sufficient contacts with medical providers, and (2) questioned coverage decisions on a couple of occasions. SAC ¶¶ 73, 107, 119-20, 136–37. These allegations neither admit nor suggest that the CMS audit revealed to the government "substantially the same allegations" in the scope, scheme, mechanics, or details of this intentional systemic fraud.  Nor is there any

---

[31] *Bellevue*, 867 F.3d at 715 n.1 (7th Cir. 2017) (documents attached to motion to dismiss); *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 271 (7th Cir. 2016) (documents attached to the complaint); *United States ex rel. Ziebell v. Fox Valley Workforce Dev. Bd., Inc.*, 806 F.3d 946, 953 (7th Cir. 2015) (following summary judgment where relator admitted that her knowledge derived from a public disclosure); *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492 (7th Cir. 2003) (summary judgment); *United States ex rel. Lisitza v. Par Pharm. Cos., Inc.*, No. 06 C 06131, 2017 WL 3531678 (N.D. Ill. Aug. 17, 2017) (summary judgment); *United States ex rel. Frawley v. McMahon*, No. 11-CV-4620, 2016 WL 5404598 at \*9 (N.D. Ill. Sept. 28, 2016) (document attached to the motion to dismiss); *United States ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 659 (N.D. Ill. 2015) (documents attached to motion to dismiss);  *Bannon v. Edgewater Med. Ctr.*, 406 F. Supp. 2d 907, 919 (N.D. Ill. 2005) (documents attached to the complaint and motion to dismiss).

suggestion that Dr. Nedza pleaded from an audit rather than her personal knowledge.

Even modest differences between the fraud allegations and any potential public disclosure are enough to defeat dismissal on public disclosure grounds. *Goldberg*, 680 F.3d at 934–35 (holding allegations of insufficiently supervised surgeries were not substantially similar to unsupervised surgeries). CMS audits in general are limited and consider just a handful of patient examples.[32] "A single broken branch does not mean that the entire tree is diseased." *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015) (rejecting the argument that a prior FCA case against a subsidiary disclosed a related fraud by the parent company and other subsidiaries nationwide).

In contrast, Relator alleges far more extensive and crucial information about the fraud than would be captured in a CMS audit, including the details of a premeditated fraudulent system to produce illegal denials of medical services across dozens of MA Plans that involves such additional fraudulent practices as case aging, rigged fax machines, and faulty algorithms. *See supra* Section II.A; *Leveski*, 719 F.3d at 829-830 (holding FCA claim not barred by a prior FCA case about the same basic fraud with a different technique in a different department of the same defendant). Relator further alleges admissions and facts to reveal knowledge and intent. *Supra* Section IV.B. Evidence of scienter, like Relator provides, overcomes the public disclosure bar. *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 869 (7th Cir. 2011); *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 708-09 and n.10 (7th Cir. 2014).

---

[32] An audit for timeliness, for instance, might look at 5 pre-authorization examples while an audit of dismissals could consider 15 examples across all services. *See* CMS, Part C Organization Determinations, Appeals and Grievances (ODAG) Program Area: Audit Process and Data Request, OMB No: 0938-1000 (Expires: 04/30/2020) CMS-10191 at 5-8, 11, 16, *available at*, www.cms.gov/Medicare/Compliance-and-Audits/Part-C-and-Part-D-Compliance-and-Audits/ProgramAudits.html (from list of pdf and zip files, select 2017_Medicare_Parts_C_and_D_Program_Audit_Protocols_and_Data_Requests [ZIP, 10MB]) (last visited May 31, 2018).

Defendants offer nothing to show that the audits revealed "substantially the same" conduct as alleged in the SAC, nor is there any suggestion that Relator pled from the CMS audits, copies of which she does not have, rather than her personal knowledge. There is nothing parasitic about the SAC. Drawing all inferences in favor of Relator, as required on this motion to dismiss, there is no basis to hold the allegations have been publicly disclosed.

## 2. Even if there was a public disclosure, Relator is an original source.

Without the text of any specific disclosure, let alone one "substantially similar" to the SAC, the public disclosure analysis does not even reach the "original source" inquiry. Yet even assuming *arguendo* that there was a public disclosure, Relator is an original source because she (1) has information "independent" of the prior public disclosure from her employment, SAC ¶¶ 16, 26; (2) provided it to the Government, SAC ¶ 26; and (3) such information "materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B) (2010).[33]

Under the 2010 FCA amendments, "the focus" of the original source inquiry "is on what independent knowledge the relator has added to what was publicly disclosed." *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 299 (3d Cir. 2016). A relator "materially adds" to the public disclosure where she contributes "significant additional information," such as "additional details" about the fraud, *id.*, or can "add value to what the government already knew." *United States ex rel. Hastings v. Wells Fargo Bank, NA, Inc.*, 656 F. App'x 328, 332 (9th Cir. 2016). Even if the basic fraud had been disclosed, Relator "materially adds" "significant additional information," including information about AIM's practices and role of key executives, the scope, mechanics and methods of fraud, and scienter. *Supra* Section II.A.

---

[33] The 2010 FCA amendments that changed the language in the "original source" section of the FCA is retroactive. Thus, this analysis proceeds only under the current text of the FCA. *Bellevue*, 867 F.3d at 718.

To the extent Defendants argue that under *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 283 (7th Cir. 2016), any complaint that is "substantially similar" to a public disclosure cannot "materially add" to that disclosure, such an interpretation cannot be reconciled with the FCA. Equating these two tests "would read out of the statute the original source exception." *Moore & Co., P.A.*, 812 F.3d at 306. The entire purpose of the original source exception is that relator can proceed even if the fraud is "substantially similar" to one already disclosed. In *Cause of Action*, the court had no need to examine the standard for "materially adds" because the relator in that prototypical parasitic lawsuit had no information "independent" of a public audit. *Cause of Action*, 815 F.3d at 283.[34] The relator's allegations there were derived from and the same as the public disclosure; it could not "materially add" to the public disclosure under any standard.[35]

The original source exception protects the cases of genuine whistleblowers, such as Dr. Nedza, who provide extensive, detailed, essential information about fraud. The SAC must not be dismissed on public disclosure grounds.

B. <u>While not warranted, a dismissal—on any grounds—should be without prejudice.</u>

As stated in detail above, the SAC amply complies with the applicable pleading requirements, and Defendants' Motions should be denied. However, to the extent the Court finds any pleading deficiency, any dismissal of the SAC should be without prejudice. "Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to

[34] The entirety of the discussion of the "materially adds" issue reads: "Second, because Cause of Action's allegations are substantially similar to those contained in the Audit Report, its information has not 'materially add[ed]' to the public disclosure. 31 U.S.C. § 3730(e)(4)(B) (2012)." *Cause of Action*, 815 F.3d at 283.

[35] Similarly, *Bellevue* simply relies on *Cause of Action* again without analysis. There, the court held that a complaint that "did not supply any genuinely new and material information," where the alleged additional details were "at best, a conclusory allegation that lacks any factual support," was both "substantially the same" as the public disclosure and did not "materially add" to that disclosure. 867 F.3d at 720-21.

dismiss." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015).[36] *See also United States ex rel. Keen v. Teva Pharm. USA Inc.*, No. 15 C 2309, 2017 WL 36447, at *6 (N.D. Ill. Jan. 4, 2017) (dismissing an FCA complaint on particularity "without prejudice").

## VI.    Conclusion

For years, Defendants have defrauded the government by systematically and intentionally providing substantially less Medicare insurance coverage than CMS purchased and denying often critical medical services to which seniors on Medicare were legally entitled. The false statements and claims made to perpetuate this fraud, in which Defendants consciously chose profits over patients, violate the FCA. Relator pleads the scheme with sufficient factual basis as the former Chief Medical Officer of AIM and sufficient plausibility based on Defendants' admissions and a myriad of other facts only available to a courageous insider whistleblower. Defendants should not escape justice now on imagined pleading technicalities and purported limits to the FCA that do not exist. Defendants' Motions should be denied.

---

[36] While the operative complaint is the "Second" Amended Complaint, the first amendment occurred to update the allegations at the Government's declination and second, with leave of the Court, made two minor technical corrections to present the Court with a clean record. ECF No. 97. Defendants' initial motions to dismiss are pending. Accordingly, the Seventh Circuit's command that an initial dismissal should be without prejudice applies.

Dated: June 4, 2018

*Respectfully Submitted*:
*Counsel for Relator*

*/s/ Matthew J. Piers*
Matthew J. Piers, mpiers@hsplegal.com
Juliet Berger-White, jberger-white@hsplegal.com
Charles Wysong, cwysong@hsplegal.com
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
70 W. Madison Street, Suite 4000
Chicago, IL 60602
312.580.0100

Steven Cohen, scohen@cohenlawgroup.com
COHEN LAW GROUP
70 West Madison Street, Suite 4000
Chicago IL 60602
312.327.8800

Erika Kelton, ekelton@phillipsandcohen.com
Peter Budetti, pbudetti@phillipsandcohen.com
Samuel Brown, sbrown@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave. NW
Washington, DC 20036
202.833.4567

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that he caused a copy of this **RELATOR'S**

**OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

to be served through CM/ECF system to counsel of record on June 4, 2018.

Respectfully submitted,

*/s/ Matthew J. Piers*

One of the Attorneys for
Relator-Plaintiff Dr. Susan Nedza

Matthew J. Piers, mpiers@hsplegal.com
Juliet Berger-White, jberger-white@hsplegal.com
Charles Wysong, cwysong@hsplegal.com
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
70 W. Madison Street, Suite 4000
Chicago, IL 60602
312.580.0100

Steven Cohen, scohen@cohenlawgroup.com
COHEN LAW GROUP
70 West Madison Street, Suite 4000
Chicago IL 60602
312.327.8800

Erika Kelton, ekelton@phillipsandcohen.com
Peter Budetti, pbudetti@phillipsandcohen.com
Samuel Brown, sbrown@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave. NW
Washington, DC 20036
202.833.4567