# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES, ex rel. DR. SUSAN NEDZA, ) | |
| ) | |
| Plaintiff-Relator, ) | |
| v. ) | Case No. 15 C 6937 |
| ) | |
| AMERICAN IMAGING MANAGEMENT, INC., ) | Judge Jorge L. Alonso |
| et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff-Relator Dr. Susan Nedza ("Relator"), on behalf of the United States, has brought this *qui tam* action against defendants for their alleged violations of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*. Before the Court are defendants' motions to dismiss Relator's second amended complaint ("SAC") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the reasons set forth below, the Court grants the motions [101], [133], [144], [149], [152], [157], [160].

## BACKGROUND

**A.    The Parties**

Relator Dr. Susan Nedza served as the Chief Medical Officer for American Imaging Management, Inc. ("AIM") and was a member of AIM's executive team from July 2012 to January 2015. (SAC ¶ 16.) In this role, she worked on, among other things, compliance with Medicare policies and regulations. (*Id*.)

The federal government administers the Medicare program through United States Department of Health and Human Services ("HHS"). (*Id*. ¶ 20.)

Defendants AIM[1], Anthem Inc. ("Anthem"), and numerous Medicare Advantage ("MA") insurance plans that allegedly contracted with AIM for its Utilization Management ("UM") review process, including Anthem Health Plans of Kentucky, Inc.; Anthem Health Plans of New Hampshire, Inc.; Anthem Health Plans, Inc.; Anthem Insurance Companies, Inc.; Blue Cross of California; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross and Blue Shield Healthcare Plan of Georgia; Community Insurance Co.; Compcare Health Service Insurance Corp.; Empire Healthchoice HMO, Inc.; Empire Healthchoice Assurance, Inc.; Health First Health Plans, Inc.; HMO Colorado, Inc.; HMO Missouri, Inc.; Blue Cross of Idaho Care Plus, Inc.; Blue Cross Blue Shield of Michigan Mutual Insurance Company; Blue Cross and Blue Shield of North Carolina; Moda Health Plan, Inc.; Priority Health; Providence Health Plan; Providence Health Assurance; Regence BlueCross BlueShield of Oregon; Regence BlueCross BlueShield of Utah; Regence BlueShield; Regence Blue Shield of Idaho; Asuris Northwest Health; and PacificSource Community Health Plans. (*Id*. ¶¶ 21-23.)

**B.** **Medicare**

Medicare is a federally-funded health insurance program that covers medical expenses for individuals over the age of 65, those who are disabled, or those who suffer from End Stage Renal Disease. (*Id*. ¶ 27.) The program has four parts, and the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS") administers it. (*Id*. ¶¶ 27, 28.) As relevant here, Medicare Part C provides the same benefits as traditional Medicare[2] but operates under a managed care model. (*Id*. ¶ 30.) Under this model, Medicare pays private MA plans a monthly

---

[1] AIM is a specialty health benefits management corporation. (SAC ¶ 21.) AIM determines health insurance coverage in areas of radiology, cardiology, oncology, specialty drugs, and sleep medicine for over 48 health plans with approximately 38 million covered members. (*Id*.)
[2] Traditional Medicare operates on a "fee-for-service" basis where providers are directly paid for their services. (SAC ¶ 29.)

capitation rate (a fixed amount per member). (*Id*.) The MA plans then pay providers for the services. (*Id*.) The capitation rate depends on the beneficiary's geographic location, income status, gender, age, and health status. (*Id*.)

C.     **Plan C: Medicare Advantage**

MA insurance plans are required to and must certify that they provide beneficiaries with all services and benefits required under traditional Medicare, including all "medically necessary" services and benefits as defined by Medicare Rules. (*Id*. ¶¶ 32, 35); 42 U.S.C. § 1395w-27(g)(1). The MA insurance plans must also certify their compliance with the Medicare statute, Medicare regulations, and all Medicare non-regulatory guidance, procedures, and policies regarding coverage and treatment of beneficiaries (collectively the "Medicare Rules"). (*Id*. ¶ 32); *see also* 42 U.S.C. § 1395w-27; 42 CFR § 422.101; 42 CFR § 422.504(a). These plans must make "individual medical necessity determinations" and consider "the enrollee's medical history" when determining appropriate Medicare coverage. (*Id*. ¶ 39.) According to the CMS Medicare Managed Care Manual, "MA Plans may not implement utilization management protocols that create inappropriate barriers to needed care." (*Id*.); *see also* CMS, Medicare Managed Care Manual, § 4.110.1.1. MA insurance plans must have a compliance program in place to monitor and audit the plans. (*Id*. ¶ 42.) While MA insurance plans are allowed to subcontract, the plans are ultimately responsible for complying with the terms of its contract with CMS. (*Id*. ¶ 33.) Ultimately, the MA plans are required to "assume the full financial risk" for the cost of required care. (*Id*. ¶ 31); 42 U.S.C. §1394w-25(b).

D.     **Relator's Allegations**

According to Relator, AIM promised the defendant insurance plans that it could cut their costs and increase their profits. (*Id*. ¶¶ 45-50.) Enticed by promises of profit, the defendant

3

insurance plans hired AIM. (*Id*. ¶¶ 45-50.) The only problem with this relationship, according to Relator, was that, while the defendants may have saved money, they did so by denying care to Medicare beneficiaries in violation of Medicare Rules. (*Id*.)

### 1. AIM's Utilization Management review process

Under the MA program, AIM required beneficiaries to go through a pre-authorization process[3]. (*Id*. ¶ 58.) AIM typically reviewed requests for Computerized Tomography ("CT"), Echocardiography, Magnetic Resonance Angiograms ("MRA"), Magnetic Resonance Imagining ("MRI"), and Positron Emissions Tomography ("PET") scans as well as sleep studies. (*Id*. ¶ 52.)

AIM's UM review process had several steps. First, a medical provider, such as a treating doctor, would submit a request with basic information to AIM for pre-authorization insurance coverage. (*Id*. ¶¶ 51-57.) Second, AIM would decide whether the insurance plan should approve the pre-authorization request. (*Id*.) AIM would review the requests using algorithms based on its own standards (without regard for Medicare Rules and medical appropriateness). (SAC ¶ 54.) If a request was denied, the medical provider would then speak with an AIM nurse who would use the same AIM algorithm as well as AIM's "MD/RN tool." (SAC ¶ 55.) If the request was again denied, the medical provider would then speak with one of AIM's physician reviewers. (SAC ¶ 56.) If the request was still denied, then AIM would deny the pre-authorization request for services. (*Id*.) Third, AIM would advise the insurance plan, medical provider, and/or the MA beneficiary of its determination. (*Id*.) Fourth, the insurance plan would ultimately adopt AIM's decision. (*Id*.)

---

[3] Under traditional fee-for-service Medicare plans, beneficiaries do not need to go through formal pre-authorization before receiving diagnostic imaging procedures. (SAC ¶ 58.)

According to Relator, AIM created the review process to limit costs and increase savings. (*Id*. ¶¶ 58, 59.) She says that, in doing so, AIM violated Medicare Rules and created improper barriers to care deemed necessary by a treating physician. (*Id*.)

### 2. Scheme to deny requests for approval

Relator alleges that defendants improperly engaged in a scheme to deny Medicare beneficiaries' pre-authorization requests for approval for diagnostic testing in order to save money. Relator lists many examples of the alleged improper behavior. First, Relator alleges that, at times, AIM leadership would turn off the first step of its UM review process and send all pre-authorization requests to the second step so that it could meet its cost savings goals. (*Id*. ¶¶ 62, 63.)

Relator further alleges that AIM would prohibit nurse and physician reviewers from making more than one follow-up contact, which increased the desired denial rates. (*Id*. ¶ 72.) She says that this policy contradicts Medicare rules which require "reasonable and diligent efforts to obtain all necessary medical records and other pertinent information within the required time limits." (*Id*.) Relator says that AIM was aware that the policy violated CMS rules but waited years to change its practice. (*Id*. ¶ 73.) Relator further alleges that AIM arbitrarily denied requests when the medical provider failed to respond to AIM within one business day of contact. (*Id*. ¶ 74.) This practice also increased the desired denial rates. (*Id*.)

Additionally, Relator alleges that AIM created an arbitrary and undisclosed limit of ten pages on faxes received from medical providers—AIM's faxes would stop printing medical records after ten pages, resulting in the loss of critical medical information. (*Id*. ¶ 77.) Relator says that this practice violated AIM's duty to make individualized coverage determinations based on a patient's medical history, Medicare Rules requiring an insurance plan to provide a fair process to

5

make decisions based upon medical need, and a violation of the requirement that decisions be based on "all relevant documentation that is submitted with the claim." (*Id*. ¶ 79.)

Relator also says that the defendant insurance plans knowingly failed to provide full coverage guaranteed by Medicare when they contracted with AIM by using AIM Guidelines, rather than Medicare Rules, when making a medical necessity determination. (*Id*. ¶ 83.) By using the AIM Guidelines, AIM denied Medicare beneficiaries the right to an individualized review based on medical need and violated Medicare's requirement that insurance plans provide all medically necessary care. (*Id*. ¶ 84.) According to Relator, the AIM Guidelines were not based on and were more stringent than Medicare Rules. (*Id*. ¶ 89.)

Relator next alleges that AIM falsified Medicare notices to Medicare beneficiaries. (*Id*. ¶¶ 93, 94.) AIM did so by quoting language from AIM Guidelines in its denial letters rather than providing an individual with the actual reason for the denial. (*Id*.) Lastly, Relator says that AIM established rules to increase denials and also trained and directed staff to deny requests so as to save money. (*Id*. ¶¶ 95-105.)

### 3. Defendants' non-compliance with Medicare Rules

According to Relator, AIM knew that its Guidelines and review process did not meet Medicare's requirements and that its UM review process violated Medicare Rules. (*Id*. ¶ 106.) For example, in 2013, AIM medical staff members reviewed 164 Medicare patient files that AIM had denied and discovered that 160 should have been approved. (*Id*. ¶ 108.) Relator says that AIM, Anthem, and the defendant insurance plans openly discussed the choice to violate Medicare Rules in search of profits. (*Id*. ¶¶ 111-116.) She says that, despite this dialogue, AIM continued to not comply with Medicare Rules. (*Id*.)

Relator further alleges that, from January to April 2014, AIM attempted to use a new review process, but the process was quickly rejected. (*Id*. ¶ 118.) In response to increasing pressure from client insurance plans[4], AIM created a modified review process—the "hybrid" review process—that followed Medicare Rules. (*Id*. ¶¶ 119.) But AIM soon abandoned the "hybrid" model because denials and savings plummeted. (*Id*. ¶ 125-127.) AIM then created another review process, called the "hierarchical model," a review process that was closer to complying with the Medicare Rules. (*Id*. ¶ 127.) Even though AIM was creating new review processes for the defendant insurance companies to use, it was still offering the traditional UM review process. (*Id*. ¶¶ 128-129.)

Relator says that AIM's parent company, Anthem, was aware of AIM's noncompliance with Medicare Rules, endorsed AIM's practices and improperly profited from it. (*Id*. ¶¶ 132-136.) She says that, following a CMS audit in 2011 or 2012, Anthem stopped using the AIM UM review process. (*Id*. ¶¶ 137-129.) However, Anthem allowed AIM to continue to sell the UM review process, and, in late 2014, Anthem started using the AIM UM review process again. (*Id*. ¶¶ 138-140.)

Relator alleges that the defendant insurance plans knew or recklessly disregarded the fact that the AIM UM review process violated Medicare Rules because the insurance plans enjoyed the profits. (*Id*. ¶¶ 143-149.)

---

[4] CMS began auditing several of AIM's client insurance plans and began to adjust payments to MA plans based on quality ("star") ratings of the plan. (*Id*. ¶¶ 119-122.) "CMS rated the performance of each MA Plan on numerous metrics and assigned the plan a 'star' rating for the year." (*Id*. ¶ 122.) According to Relator, higher rated plans received a higher capitation payment than lower rated plans. (*Id*.)

### 4. Enrichment of defendants at the expense of Medicare beneficiaries

According to Relator, by using AIM's UM review process, the defendant insurance plans denied Medicare beneficiaries coverage for services that should have been approved. (*Id.* ¶ 150.) She says that "AIM knowingly made wrongful denials that cheated Medicare beneficiaries out of care and cheated the government out of capitation payments." (*Id.* ¶ 152.) In other words, "[t]he Medicare beneficiaries received less care than the government purchased on their behalf, and less care than the Defendant Insurance Plans certified they would pay for." (*Id.*) Essentially, Relator alleges that defendants engaged in a scheme to profit off the backs of Medicare beneficiaries by denying them needed medical services and pocketing the government funds.

### 5. Denial of requests for pre-authorization caused submission of False Claims to the MA program

Relator alleges that defendants presented false or fraudulent claims for payment or approval to the government in violation of 31 U.S.C. § 1395w-27 when they provided non-compliant coverage determinations. (*Id.* ¶ 155.) She says that, to participate in the MA program and receive government payments, the defendant insurance plans must contract with CMS. (*Id.* ¶ 156.) As required by those contracts, the defendant insurance plans are required to certify that they will comply with all Medicare Rules. (*Id.*) According to Relator, defendants' certifications were false because they did not comply with Medicare Rules and, without the false certification, the defendant insurance plans would not have received payment under the MA program. (*Id.*)

### E. Procedural Posture

On August 7, 2015, Relator filed this suit. (Dkt. 1.) On October 6, 2017, the United States declined to intervene. (Dkt. 15.) On February 23, 2018, Relator filed her SAC. (Dkt. 121.) All defendants have moved to dismiss.

**STANDARD**

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in Relator's favor. *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipsis omitted). Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S.at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Moreover, claims under the FCA are subject to the heightened pleading requirements of Rule 9(b). *Thulin v. Shopko Stores Operating Co.*, 771 F.3d 994, 1000 (7th Cir. 2014). To satisfy 9(b), Relator's claims must be pleaded "with particularity"; that is, they must describe "the who, what, when, where, and how of the fraud." Fed. R. Civ. P. 9(b); *AnchorBank, FSB v. Hofer*, 649

F.3d 610, 615 (7th Cir. 2011). However, the "the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank,* 649 F.3d at 615. Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

## DISCUSSION

A claim under the FCA requires the following elements: "(1) the defendant made a statement in order to receive money from the government; (2) the statement was false; (3) the defendant knew that the statement was false; and (4) the false statement was material to the government's decision to pay or approve the false claim." *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 561 (7th Cir. 2015) *cert. denied*, 136 S. Ct. 2510, 195 L. Ed. 2d 840 (2016). Relator's "complaint [is] not required to include a legal theory," but the complaint must still plead sufficient facts to make it plausible that defendants committed an actionable False Claims Act violation. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 784 (7th Cir. 2016) (Hamilton, J. concurring in part and dissenting in part).

Relator asserts that defendants violated the FCA when they falsely certified they would follow and were following Medicare Rules. Relator says that the SAC's allegations fit in to at least three judicially-recognized rubrics for FCA liability, including fraudulent inducement, false claims for nonconforming services, and implied false certification.

The Court finds that Relator has failed to allege with particularity a claim under the legal theories of fraudulent inducement or false claims for non-conforming services. Nowhere in the SAC does Relator assert that CMS was fraudulently induced into contracting with the defendants

10

for provision of Medicare Advantage plans. Moreover, Relator does not identify, let alone allege, any false claims for payment beyond the defendant's requests for capitation payments. And it would be somewhat odd to characterize Relator's FCA claim as false claims for non-conforming services given that the contract between CMS and the defendant MA plans was not a fee-for-service contract, but, rather, was based on a fixed capitation rate—a fixed fee per member per month, based on the beneficiary's geographic location, income status, gender, age, and health status. The capitation rate is notably not based on benefits recouped by beneficiaries, and Relator does not plead any factual details to support the conclusion that any beneficiaries in fact received deficient Medicare coverage for which the defendant insurance plans received payment. Further it is not apparent from Relator's complaint that the requests for capitation payments made any explicit reference to particular denial rates or UM review processes.

Instead, Relator's claims most closely resemble implied false certification. Relator alleges that by the MA plans' submission of requests for capitation payments, the MA plans in effect certified to CMS that they were complying with all contractual obligations. (SAC ¶ 149.) The Court therefore finds that Relator has most closely alleged an FCA claim under a theory of implied false certification and will proceed in its analysis of Relator's complaint under that rubric.

**Implied False Certification**

Per the Supreme Court's decision in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, implied certification can serve as the basis for FCA liability under certain requirements. 136 S. Ct. 1989, 2001 (2016). The Court held that implied certification can be a basis for FCA liability only "where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual

requirements makes those statements misleading half-truths." *Id*. Further, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Id.* at 2002. In sum, in order to plead an actionable FCA claim under the implied certification theory, Relator must allege that defendants (1) submitted a claim for payment that (2) made specific representations about the services provided or failed to disclose violations of legal requirements that would make such representations misleading half-truths, and (3) those misrepresentations would be material to the Government's payment decision. *Id*. at 2001.

The parties dispute whether any of the defendants made or caused to be made any false statements or false claims; however, this Court finds that even assuming, arguendo, such statements were made, Relator's claims against all defendants fail due to Relator's failure to sufficiently plead the materiality of those statements to CMS payment decisions under *Escobar*. *Id*. at 2001-04. As this Court held in *City of Chi. v. Purdue Pharma L.P.*, we are compelled to dismiss a complaint that fails to sufficiently allege materiality as defined in *Escobar*. 211 F. Supp. 3d 1058, 1078 (N.D. Ill. 2016).

**The FCA's Materiality Requirement**

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In its extended discussion of materiality under the FCA, *Escobar* held that "a misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 136 S. Ct. at 2003. Indeed, "[t]he materiality standard is

12

demanding." *Id*. at 2003. Though no one factor is dispositive, the Court noted that "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id*. at 2003–04. The Court went on to provide examples of proof of materiality, including, but "not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." The Court specifically rejected the theory that "any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id*. at 2004.

Courts have since applied the *Escobar* materiality requirement to FCA claims stemming from the Medicare Advantage program. *See United States ex rel. Gray v. UnitedHealthcare Ins. Co.*, No. 15-cv-7137, 2018 WL 2933674, at *11 (N.D. Ill. June 12, 2018) (granting a Rule 12(b)(6) motion to dismiss on an FCA claim alleging an MA plan employed an in-home examination program that violated regulations in order to increase capitated payments in part due to failure to show that the violations were material to CMS's determinations of the capitated payment amounts). Given the capitated payment scheme of the MA program, this Court must consider "each [alleged violation of Medicare Rules via the AIM UM review process] through the lens of whether it is material to CMS's determination of the capitated payment amount." *Gray*, 2018 WL 2933674, at *7.

**Materiality of the AIM UM review process**

A utilization management review process is not in itself contrary to the Medical Rules. In fact, MA plans must "[h]ave in effect mechanisms to detect both underutilization and

overutilization of services." 42 C.F.R. §422.152(b)(2). Further, there is repeated reference to utilization management guidelines created by MA plans throughout §422 of the Code of Federal Regulations. That there are appropriate uses of utilization management tools in MA plans makes the pleading of materiality all the more important to distinguish FCA violations from innocent conduct.

In the SAC, Relator contends that defendants' alleged misrepresentations were material to government payment decisions because "[c]ompliance with 'all the applicable requirements and conditions' is expressly 'material to performance of the contract' between CMS and the MA plans." (*See* SAC ¶ 32, quoting 42 CFR § 422.504(a); 42 U.S.C. §1395w-27.) In its discussion of materiality in *Escobar*, the Supreme Court considered and rejected sweeping contractually-imposed materiality irrespective of whether payment is actually contingent on compliance. *Id*. at 2004 ("Likewise, if the Government required contractors to aver their compliance with the entire U. S. Code and Code of Federal Regulations, then under this view, failing to mention noncompliance with any of those requirements would always be material. The False Claims Act does not adopt such an extraordinarily expansive view of liability."). Similarly, Relator's contention that compliance with "all the applicable requirements and conditions" is material to continued participation in MA and receipt of MA payments advances under an extraordinarily expansive view of liability is not supported by the False Claims Act. 42 CFR § 422.504(a); *Id*. at 2004. Moreover, such bald assertions of materiality amount to no more than "threadbare recitals of the elements of a cause of action" and are not sufficient under Rule 8, let alone 9(b). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Though some of Relator's allegations come close to supporting the inference that variation in the UM review process would have been material to the government's decision to pay the

capitation payments, Relator's allegations ultimately fall short. For example, Relator notes that around 2014, CMS began implementing a quality star rating system for MA plans whereby capitation payment could be adjusted commensurate with the star rating. (SAC ¶ 122.) Relator notes that "[o]ne of the metrics in the star ratings is initial coverage denials overturned on appeal." (*Id.* ¶ 123.) Relator does not, however, elaborate on the weight of such a metric nor does Relator directly link, beyond bare inference, AIM's UM review process to initial coverage denials overturned on appeal. Further, Relator does not allege that CMS ever reduced any of the defendant MA insurance plans star ratings or that CMS ever reduced ratings of any MA insurance plan for use of a UM review process similar to AIM's.

Relator also pleads facts that directly undermine the materiality of AIM's allegedly noncompliant UM review process to CMS payment decisions. Namely, Relator alleges that CMS audited and cited several of the defendant MA plans and an unnamed Anthem insurance plan for various practices that violated Medicare Rules. (*Id.* ¶¶ 107, 119, 120, 136, 137, 145.) The only result pleaded by Relator is that the cited defendant MA plans complained to AIM. (*Id.* ¶¶ 119-20.) Relator does not allege that CMS ceased payment to the audited defendant MA plans, let alone terminated its contract with these MA plans. The fact that CMS continued to pay the audited MA plans capitation payments "in full despite its actual knowledge that certain requirements were violated . . . is strong evidence that the requirements are not material." *Escobar*, 136 S. Ct. at 2003.

Lastly, Relator's pleading of senior AIM officials' comments and concerns that AIM UM guidelines were not compliant with Medicare Rules or that defendant MA plans complained to AIM about noncompliance are similarly not compelling. Materiality under the FCA "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id*. at 2002 (quoting 26 R. Lord, Williston on Contracts § 69.12 (4th ed. 2003) (Williston)). Whether AIM or

MA plan officials thought, or even knew, that CMS could lawfully withhold payment to the defendant MA plans is not equivalent to whether CMS would in practice withhold payment. What matters, and what Relator fails to allege with particularity, is whether the government would have found use of AIM's UM guidelines material to its decision to pay. In her failure to plead any factual support to the allegation that AIM's UM review process would be material to the government's decision to pay, Relator fails to plead materiality sufficient to survive a motion to dismiss.

## CONCLUSION

Based on the foregoing, the Court finds that Relator has not sufficiently pleaded an FCA violation. Accordingly, defendants' motions to dismiss are granted, and Counts I and II are dismissed without prejudice. Relator is given leave to file a third amended complaint consistent with this Order by April 26, 2019.

**SO ORDERED.**                                       **ENTERED: March 29, 2019**

                                                                                      _____
                                                                                      **HON. JORGE ALONSO**
                                                                                      **United States District Judge**