**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES, ex rel. DR. SUSAN NEDZA, | ) | |
| | ) | |
| Plaintiff-Relator, | ) | |
| v. | ) | Case No. 15 C 6937 |
| | ) | |
| AMERICAN IMAGING MANAGEMENT, INC., | ) | Judge Jorge L. Alonso |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff-Relator Dr. Susan Nedza, on behalf of the United States, has brought this *qui tam* action against defendants for their alleged violations of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*. Before the Court is Defendants' Motion to Dismiss Relator's Third Amended Complaint ("TAC"). For the reasons that follow, the Court denies the motion as to Defendant American Imaging Management, Inc., and grants it as to Defendant Anthem Inc. [224].

## BACKGROUND

From July 2012 through January 2015, Plaintiff-Relator Dr. Susan Nedza served as Chief Medical Officer for Defendant American Imaging Management, Inc. ("AIM"). (*See* Pltf.'s TAC, ECF No. 220 at ¶ 19.) Relevant to our purposes, AIM provides certain screening services for private health insurers who, in turn, contract with the federal government to provide Medicare coverage. (*Id.* at ¶¶ 2-3, 7.) Nedza alleges that AIM—and its parent company, Defendant Anthem Inc. ("Anthem")—violated the False Claims Act ("FCA") because AIM's "pre-authorization" screening services run afoul of various Medicare rules, thereby causing the private health insurers to make fraudulent statements and claims for payment because, essentially, the insurers must say

they comply with these Medicare rules in order to ultimately receive payment from the government. (*Id*. at ¶¶ 8-10, 12-13.)

**1.  Medicare Advantage Program**

The Medicare program is a federally funded health insurance program administered by the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS"), and it covers certain medical expenses for people who are over 65 years old, who are disabled, or who suffer from end-stage renal disease. (*Id*. at ¶ 32.) The Medicare program has four parts: Part A, Part B, Part C, and Part D. (*Id*. at ¶ 33.) Parts A and B are known as "Original Medicare" and operate on a "fee-for-service" model, meaning that CMS pays hospitals and physicians directly for each covered service they provide to a Medicare beneficiary. (*Id*. at ¶ 34.) Part C, on the other hand, operates on a "managed care model" and is handled by private health insurers. (*Id*. at ¶ 33, 35.) Under this model, private insurers contract with CMS to provide coverage to Medicare beneficiaries, and instead of paying on a fee-for-service basis, CMS instead pays the private insurers a fixed amount per beneficiary each month (known as a "monthly capitation payment"). (*Id*.) This capitation payment is based on a beneficiary's geographic location, income status, gender, age, and health status, and private insurers receive this fixed amount no matter how much or how little health care the beneficiary receives. (*Id*.) The healthcare plans offered by private insurers under Part C are referred to as "Medicare Advantage plans" or "MA plans." (*Id*.)

Relying on various statutes, regulations, and CMS guidance documents like Medicare manuals, Nedza alleges that CMS imposes two requirements on private insurers that form the "core" of the Medicare Advantage program. (*Id*. at ¶ 37.) First, MA plans are required to pay for all the medical care that would be covered under Original Medicare (i.e., under the fee-for-service

model handled by CMS). This requirement—referred to as the "Basic Benefit Requirement"—means that, like Original Medicare, MA plans must cover all health care services that are deemed "reasonable and necessary." Covered services are defined in part by certain rules, known as "National Coverage Determinations" ("NCDs") and "Local Coverage Determinations" ("LCDs"). (*Id*. at ¶¶ 42-44.)

The second requirement is that MA plans must make "individualized coverage decisions." (*Id*. at ¶ 37.) When a medical provider wants a beneficiary to receive certain treatments, MA plans are allowed to use a pre-authorization review process to determine whether that treatment is covered by Medicare prior to the beneficiary receiving the treatment. But applicable Medicare rules require that any pre-authorization process must allow for "individual medical necessity determinations" for requested treatments. (*Id*. at ¶¶ 45-47.) More specifically, Nedza alleges Medicare rules require any pre-authorization process to consider individual circumstances like a beneficiary's medical history in making a coverage determination and must include a personal review conducted by a physician or "appropriate health care professional" if the MA plan ultimately denies coverage. (*Id*.) As described further below, MA plans are permitted to hire third parties to conduct this pre-authorization review process, and Defendant AIM provided these services to various MA plans.

2.      **MA Plan Contracts and Claims for Payment**

Nedza alleges that a private insurer must certify to CMS that it will comply with these two requirements in order to participate in the Medicare Advantage program and ultimately receive capitation payments from CMS. (*Id*. at ¶¶ 39, 58-60.) More specifically, a private insurer must enter into a contract with CMS to be able to offer a MA plan to beneficiaries, and to obtain a contract with CMS, a private insurer must explicitly agree to operate its MA plan in compliance

with the Medicare statute, Medicare regulations, and applicable Medicare guidance documents (including Medicare manuals), which again, impose these two "core" requirements. The insurer explicitly certifies compliance in the MA plan contract, a "benefit attestation" which is attached to the MA plan contract, an annual renewal of the MA plan contract, and in an annual "bid package" submitted by the insurer, which specifies the services the insurer pledges the MA plan will provide. (*Id*. at ¶¶ 48-53, 164-165.) Medicare regulations state that these terms of the MA contract documents are "material to the performance of the MA contract." (*Id*. at ¶ 49); *see also* 42 C.F.R. § 422.504(a). Further, even though the contracts at issue are between CMS and private insurers, Medicare regulations also require that any sub-contractors that help operate the MA plans (like Defendant AIM) must also comply with all applicable Medicare rules and regulations, including the two core requirements discussed above. (ECF No. 220 at ¶ 57); 42 C.F.R. § 422.504(i).

In addition to the MA plan contract documents, Nedza also alleges that MA plans impliedly certify compliance with these Medicare rules and regulations in their requests for capitation payments. Every month, each MA plan submits a request for a capitation payment, and this request includes (1) a plan identification number which corresponds to the package of services promised in the MA plan's annual bid package; (2) the number of individuals enrolled in the MA plan; and (3) a certification by the insurer that each individual is validly enrolled in the MA plan and that the information relied upon by CMS in determining the capitation payment is accurate, complete, and truthful. (*Id*. at ¶¶ 55-56, 166.) Nedza alleges that this certification is premised on the representations made in the annual bid package, and as such, this certification implies each MA plan "provided all services promised in its MA contract . . . in compliance with all Medicare coverage rules." (*Id.*)

Nedza alleges that if a MA plan fails to comply with the two core requirements discussed above, then this failure violates the terms of the MA contract. (*Id.* at ¶ 58.) Further, Nedza alleges that if CMS knew that a private insurer falsely certified compliance with these requirements in its MA plan contract documents, CMS would not have entered into a contract with the private insurer; likewise, if CMS knew that a MA plan violated these requirements, it would not issue monthly capitation payments to the MA plan. (*Id.* at ¶¶ 59-60.)

### 3. AIM's "Rigged" Pre-Authorization Review Process

Defendant AIM contracts with MA plans to provide review of pre-authorization requests by medical providers for coverage of certain medical treatments; this pre-authorization review service falls under the umbrella of so-called "utilization management" protocols permitted by Medicare rules and regulations. (*Id.* at ¶¶ 7, 26.) In essence, Nedza claims AIM purposefully developed a "rigged" pre-authorization review process that intentionally violated the Medicare requirements discussed above in an effort to maximize coverage denials, which Nedza alleges allowed MA plans to keep a greater share of CMS capitation payments thereby increasing MA plans' profits. (*Id.* at ¶¶ 8-14.)

Nedza alleges that AIM promised in both its marketing materials and its contracts with MA plans that its pre-authorization process would hit specific denial rates; AIM promised denial rates as high as 5 to 9 percent when it knew that denial rates would be much lower if it complied with Medicare rules (e.g., Nedza alleges Medicare-compliant pre-authorization review for diagnostic imaging services[1] would have a denial rate of 0.5 to 1.5 percent). (*Id.* at ¶¶ 62-64.) Nedza alleges that, to her knowledge, "AIM never failed to meet a contractual denial target for any MA plan." (*Id.* at ¶ 66.)

---

[1] The TAC focuses on AIM's pre-authorization review services relating to diagnostic imaging procedures, but Nedza alleges AIM reviewed requests for other medical procedures as well. (*Id.* at ¶¶ 25, 68.)

AIM's pre-authorization process generally worked as follows: (1) a medical provider would send AIM a request for pre-authorization on behalf of a MA plan beneficiary; (2) AIM would determine whether the pre-authorization request should be approved or denied; (3) AIM would communicate this determination to the private insurer operating the MA plan, the medical provider, and/or the MA beneficiary; and (4) the insurer would adopt AIM's decision to approve or deny the request. (*Id.* at ¶ 67.) Nedza alleges the second step of AIM's process—AIM's review of the request—was rigged in a number of ways.

AIM's review was a multi-step process. First, after a medical provider submitted a pre-authorization request, AIM used a computer algorithm to do an initial evaluation. If the algorithm denied the request, AIM then had a nurse review the request. If the nurse also determined the request should be denied, then a physician reviewed the request, and if the physician denied the request, AIM formally denied pre-authorization. (*Id.* at ¶¶ 70-74.)

Nedza alleges that AIM rigged the first step of this review—the computer algorithm—to maximize denials. In relevant part, Nedza alleges the algorithm typically approved 70 to 80 percent of requests. However, if AIM determined that it was in jeopardy of not meeting a contractual denial rate, AIM would simply "turn off" the algorithm and categorically deny all requests at this initial stage. (*Id.* at ¶¶ 76-79.) When AIM would decide to turn off the algorithm, it would allegedly do so without any regard for medical necessity and rather solely "to increase denial rates in order to meet contractual denial targets." (*Id.*)

AIM allegedly used a number of procedural gimmicks to rig the next steps of its review and increase denials. For instance, AIM had an internal policy dubbed "case aging" whereby if a medical provider failed to return a call from AIM within one business day, AIM simply had one of its staff physicians officially deny the request without conducting any type of review. (*Id.* at ¶

86-87.) AIM had another internal rule—the "one contact limit" rule—that prohibited its nurse and physician reviewers attempting to contact a medical provider more than once to get information related to a pre-authorization request. (*Id.* at ¶¶ 88-90.) Nedza alleges that AIM also arbitrarily set its fax machines to stop printing medical records sent by medical providers after 10 pages, thereby potentially eliminating medical information necessary to grant a pre-authorization request. (*Id.* at ¶¶ 91-93.) None of these policies were disclosed to medical providers or MA plan beneficiaries.

Nedza alleges that AIM also rigged its review process even where its nurses and physicians substantively reviewed a pre-authorization request. Nedza alleges that Medicare rules required AIM to follow any applicable NCDs and LCDs in deciding whether to approve a pre-authorization request, but AIM instead developed its own internal coverage policies that were more restrictive than—and in effect violated—applicable NCDs and LCDs.[2] (*Id.* at ¶¶ 94-104.) Nedza provides three examples of how AIM's internal guidelines materially deviated from Medicare coverage rules: (1) AIM guidelines required physical therapy prior to approving an imaging request where Medicare coverage rules did not impose such a requirement; (2) AIM guidelines denied requests for imaging "adjacent sites" where Medicare rules would cover both scans; and (3) AIM guidelines denied requests for "bilateral imaging" where Medicare rules would cover both scans. (*Id.* at ¶ 100.) Nedza also alleges that AIM engaged in a number of other practices aimed at increasing coverage denials, like conducting trainings for its nurse and physician reviewers in how to deny requests, directing nurse reviewers to not ask medical providers any follow-up questions that could

_____

[2] Nedza alleges that AIM's nurses and physicians used a "MD/RN tool" to evaluate pre-authorization requests. The MD/RN tool consists of AIM's coverage rules, policies and documents relevant to each insurance plan. The tool did not include "the content of Medicare coverage rules, LCDs, or NCDs." (*Id.* at ¶ 97.) While the tool did have links to CMS's website where one could access Medicare coverage rules, NCDs, and LCDs, AIM allegedly monitored how often these links were used and "the rate was very low." (*Id.* at ¶¶ 98-99.)

lead to approving requests, and tying a staff member's bonus and performance evaluation to the number of requests the staff member denied. (*Id*. at ¶¶ 107-116.)

Nedza's role at AIM did not involve personally processing pre-authorization requests, and she claims she left AIM without taking patient files which would allow her to cite specific names and dates where MA plan beneficiaries were wrongly denied medical care. (*Id*. at ¶¶ 19, 121.) However, Nedza alleges actions of AIM executives show that AIM was aware that its review process violated Medicare rules and regulations and that it caused AIM to wrongfully deny pre-authorization requests. (*Id*. at ¶¶ 123-143.) For example, in 2013, AIM conducted a review of 164 MA beneficiary files where AIM denied pre-authorization requests and found that the requests should have been approved in 160 of those cases. (*Id*. at ¶ 124.) Further, from January to April 2014, AIM experimented with switching certain MA plans from its "rigged" review process to a review process that only denied pre-authorization requests based on Medicare-compliant criteria, and under the latter process, denial rates dropped to close to 0 percent. (*Id*. at ¶ 134.) Then, from September to December 2014, AIM tried a "hybrid review process" that improved compliance with Medicare coverage rules but was not fully compliant, and denial rates for the hybrid model dropped to about 1 percent.[3] (*Id*. at ¶ 135-136.) Nedza also alleges that AIM executives continually discussed the legal and business risks of its "rigged" pre-authorization review process and ultimately decided to keep using the process.

Again, Nedza alleges that, through AIM's "rigged" review process, AIM knowingly violated various Medicare rules and regulations, particularly the two "core" requirements of MA plans, i.e., to provide individualized coverage determinations based on medical necessity and to cover all the same benefits under Original Medicare (i.e., under the fee-for-service model handled

---

[3] Again, these experimental review processes were only implemented for certain MA plans, and AIM continued to offer its "traditional rigged review process" during these experiments. (*Id*. at ¶ 138.)

by CMS). Nedza alleges AIM's conduct caused MA plans to provide defective and deficient Medicare coverage because, due to AIM's wrongful denials, the MA plans provided materially less coverage than a beneficiary would receive under Original Medicare. Further, Nedza alleges AIM's conduct caused MA plans to falsely represent to CMS in MA plan contract documents (which were submitted annually) that the MA plans complied with Medicare rules and regulations. Finally, Nedza alleges AIM's conduct caused MA plans to implicitly falsely represent in every monthly capitation payment request submitted to CMS that the MA plan complied with Medicare rules and regulations. (*Id.* at ¶¶ 163-166.)

### 4. Anthem's Conduct

Anthem is AIM's parent company, and Nedza alleges that AIM "was intimately involved in the design and direct approval of AIM's rigged review process." (*Id.* at ¶¶ 11.) Nedza alleges that Anthem executives had numerous conversations with AIM executives in which they discussed the fact that AIM's review process violated Medicare requirements. For example, in April 2013, Nedza reported to Dr. Richard Frank, Anthem's National Staff Vice President and Medical Director for Medicare Advantage, that AIM's policy was to deny requests for procedures pursuant to AIM's internal guidelines even where the procedure was specifically and expressly covered under Medicare. (*Id.* at ¶ 146.) Nedza alleges that Anthem had "regular oversight" of AIM, even though AIM always maintained control over its internal coverage guidelines. (*Id.* at ¶¶ 147-148.) Anthem is also the parent company for several insurers that used AIM to review pre-authorization requests for their MA plans. (*Id.* at ¶ 27.) Nedza alleges that, aside for a certain time period between approximately 2011 to 2014, Anthem directed its subsidiary insurers to use AIM, and Anthem "never ordered, instructed, or caused its subsidiary AIM to comply" with Medicare rules and regulations. (*Id.* at ¶¶ 149-155.)

**5.	Procedural History**

On August 7, 2015, Nedza filed this suit. (ECF No. 1.) Thereafter, Nedza filed a First Amended Complaint and then a Second Amended Complaint, which named Defendants AIM and Anthem as well as a number of private insurers who operated MA plans. (ECF Nos. 22 and 121.) After Defendants moved to dismiss the Second Amended Complaint, this Court granted the motions without prejudice. (ECF No. 216.) Nedza then filed its TAC, which names only AIM and Anthem as defendants.

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in Relator's favor. *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipsis omitted). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S.at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'"

*Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013) (quotations omitted). Courts consider contract documents attached to the complaint as part of the pleadings. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes"); *see also Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).

Moreover, claims under the FCA are subject to the heightened pleading requirements of Rule 9(b). *Thulin v. Shopko Stores Operating Co.*, 771 F.3d 994, 1000 (7th Cir. 2014). To satisfy 9(b), Relator's claims of fraud must be pleaded "with particularity"; that is, they must describe "the who, what, when, where, and how of the fraud." Fed. R. Civ. P. 9(b); *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011). However, the "the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank,* 649 F.3d at 615. Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

## DISCUSSION

Nedza alleges Defendants violated § 3729(a)(1)(A) (Count I) and § 3729(a)(1)(B) (Count II) of the False Claims Act ("FCA"). (ECF No. 220 at ¶¶ 168-176.) In relevant part, a defendant is liable to the United States government under the FCA if the defendant:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . .

31 U.S.C. § 3729(a)(1)(A)-(B).[4]

---

[4] The Attorney General has primary authority for enforcing the FCA, but the FCA also includes a "*qui tam* provision, which permits a private party, known as a 'relator,' to bring a civil action alleging fraud against the Government on its own behalf as well as on the behalf of the United States," if the Attorney General declines to act. *Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 272 (7th Cir. 2016); 31 U.S.C. § 3730(d). Here, after Nedza filed her suit, the Attorney General declined to intervene. (*See* ECF No. 14.)

Typically, to prevail on a FCA claim, a relator must show that (1) a defendant made a statement in order to receive money from the government; (2) the statement was false; (3) the defendant knew that the statement was false; and (4) the false statement was material to the government's decision to pay the defendant. *See Bellevue v. Universal Health Servs. of Hargrove, Inc.*, 867 F.3d 712, 716 (7th Cir. 2017); *see also U.S. ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 561 (7th Cir. 2015). Here, Nedza's complaint offers a slightly different path to FCA liability. Nedza alleges that various MA plan insurers, who are no longer named defendants, made certain statements and claims for payments to CMS, and that the Defendants' conduct *caused* the MA plans' statements and claims to be false. While Defendants make a number of arguments to dismiss the TAC, they do not argue specifically that this theory of causation somehow prevents Nedza from stating a claim. And as the statutory language above suggests, conduct that causes MA plan insurers to submit false statements and claims to CMS can fall within the purview of § 3729(a). Because the alleged conduct of AIM and Anthem differ, the Court addresses each Defendant in turn.

## I.     AIM

In support of its motion to dismiss, AIM essentially makes four arguments: (1) Nedza does not identify any false claims or false statements that could trigger FCA liability; (2) Nedza fails to adequately allege that AIM's "rigged" pre-authorization process has violated any Medicare rules or regulations; (3) Nedza fails to allege her FCA claim with particularity as required under Rule 9(b); and (4) Nedza fails to sufficiently allege the "materiality" of any false statement or claim made to CMS. (*See generally* ECF Nos. 224 (Mot. to Dismiss) and 225 (Memo. in Support).) For the reasons that follow, the Court disagrees.

## 1.    False Statements

In response to AIM's motion, Nedza claims she has alleged a FCA claim under three different theories: a "fraudulent inducement" theory, a "non-conforming services" theory, and an "implied false certification" theory.[5] (ECF No. 232 at 10-14.) The Court finds Nedza alleges facts sufficient to support a FCA claim under a fraudulent inducement theory, and as such, does not need to address whether she states a claim under the two other theories. *See U.S. ex rel. Presser v. Acacia Mental Health Clinic*, 836 F.3d at 770, 784 (7th Cir. 2016) (Hamilton, J. concurring) (noting federal pleading standards do not require a complaint to include a specific legal theory); *see also U.S. ex rel. Sloan v. Waukegan Steel, LLC*, No. 15 C 458, 2018 WL 1087642, at *4 (N.D. Ill. Feb. 28, 2018) (rejecting argument to dismiss relator's FCA claim for failure to specify a legal theory or particular provision of the FCA).

Where a defendant causes a contract to be procured by fraud, all claims for payment made under that contract are deemed false for purposes of the FCA, even if the claims do not themselves contain a false statement. *U.S. ex rel. Marcus v. Hess*, 63 S. Ct. 379, 384 (1943) (holding the initial act of fraud to induce government contract "tainted" every subsequent claim for payment); *see also U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005); *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853-54 (7th Cir. 2009). In *Main*, the relator sued a defendant university under the FCA, alleging the university lied in a government contract when it agreed it would not pay recruiters contingent fees for enrolling students because the university did, in fact, pay recruiters. *Main*, 426 F.3d at 916. The Seventh Circuit reversed the district court's dismissal of the case and held that if the defendant knew about the rule against contingent fees and told the

---

[5] In her response brief, Nedza appears to label this theory as "fraudulent inducement through false certifications," but the Court finds this to be the implied false certification theory. *See Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016).

government it would comply "while planning to do otherwise, it is exposed to penalties under the False Claims Act." *Id*. at 917. Accordingly, in order to survive a motion to dismiss based on a fraudulent inducement theory in the Seventh Circuit, a "relator need only provide a plausible basis for believing that the defendant entered into a government contract with the intent not to perform or with the knowledge that it could not perform as promised." *U.S. ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 914 (N.D. Ill. 2015); *U.S. ex rel. Upton v. Family Health Network, Inc.*, No. 09 C 6022, 2013 WL 791441, at *3 (N.D. Ill. Mar. 4, 2013); *U.S. ex rel. McCarthy v. Marathon Techs., Inc.*, No. 11 C 7071, 2014 WL 4924445, at *5 (N.D. Ill. Sept. 30, 2014).

Here, Nedza provides this plausible basis. Nedza alleges that both the annual MA contract and a "benefit attestation" attached to the MA contract explicitly require the insurer to operate the MA plan in compliance with all Medicare statutes, regulations, and policies (specifically including the "Medicare Managed Care Manual"). (ECF No. 220 at ¶¶ 48-53.) Nedza attaches examples of these contract documents containing the relevant language to her TAC. (*See id*. at Exhibit 1 (2016 MA Contract Template) and Exhibit 2 ("CY 2016 Benefit Attestation).) As a MA subcontractor performing pre-authorization reviews, AIM was also required to comply with Medicare statutes, regulations, and policies. (*Id*. at ¶ 57.)[6]

For the reasons discussed below, AIM's pre-authorization review process allegedly violated Medicare rules and regulations, thereby violating these terms of the MA contract documents. Nedza directly alleges that AIM knowingly caused MA plans to certify compliance when it intended to violate certain Medicare rules and regulations (*Id*. at ¶¶ 164-165), and she

---

[6] In addition to having this subcontractor requirement as a material term in the contract between CMS and a MA plan, Medicare regulations also require any contracts between the MA plans and subcontractors to contain such a term. 42 U.S.C. § 422.504(i)(4)(v) ("All contracts…must specify that the…subcontractor must comply with all applicable Medicare laws, regulations, and CMS instructions.").

offers further factual support for this allegation. Nedza alleges various comments and conduct by AIM executives that show they knew for multiple years that their review process violated Medicare rules. (*See e.g., id.* at ¶¶ 127-143.) Nedza also alleges the MA contract documents were renewed annually, and thus, AIM and the MA plans certified compliance with Medicare rules and regulations annually. As such, Nedza has sufficiently alleged that AIM caused MA plans to certify compliance with Medicare rules when AIM knew it violated Medicare rules and intended to continue violating Medicare rules.[7]

## 2. Violations of Medicare Rules

Again, Nedza alleges that AIM knowingly designed and operated a "rigged" pre-authorization review process that violated Medicare rules and regulations, and because AIM's clients had to certify compliance with Medicare rules and regulations to enter into MA plan contracts and ultimately receive payment, AIM's conduct rendered these certifications false. Thus, for Nedza to state a claim, she must plausibly allege that AIM's pre-authorization review process does violate Medicare rules and regulations.

Nedza alleges AIM knowingly violated Medicare rules and regulations that constitute two "core" requirements of the MA program: (1) that MA plans cover all medical care covered under Original Medicare (i.e., the "Basic Benefit requirement"), and (2) that MA plans have processes in place that allow for individualized coverage determinations based on medical necessity. In her TAC, Nedza points to various portions of the Medicare statute, regulations, and Medicare Managed Care Manual that appear to collectively form the basis of these two requirements. *See* 42

---

[7] AIM attempts to distinguish this case from cases like *Main*, *Hess*, and *Upton* by arguing those cases involve "express certifications" and this case involves only "generic certifications." (ECF No. 236 at 6.) The MA contract documents contain multiple compliance provisions—some of which are generic certifications—but they are all *expressly* contained in the contract documents. Further, to the extent that the broadness of a generic certification matters, the Court addresses this in its "materiality" analysis.

U.S.C. §§ 1395w-22(a),(g), 1395w-27(a),(g), 1395y(a),(l), 1395ff; 42 C.F.R. §§ 422.101(a),(b), 422.112(a)(6)(ii), 422.566(a),(d); CMS Medicare Managed Care Manual, §§ 4.10.2, 4.10.16, 4.90.1. Notably, AIM does *not* contest that Medicare rules impose these two "core" requirements.

Instead, AIM argues that even assuming its pre-authorization review process is rigged in the ways that Nedza claims, AIM's conduct does not violate Medicare rules. (ECF No. 225 at 14-16.) Some ways in which Nedza claims AIM rigs its system to increase denials do not appear to violate Medicare rules (e.g., employee trainings and tying employee evaluations and bonuses to denials). But when considering other alleged practices together, Nedza plausibly alleges AIM's process violates the two core requirements.

For example, Nedza alleges that, when AIM is not denying a sufficient number of pre-authorization requests for a particular MA plan, it simply turns off its algorithm (i.e., the first step of its process) and categorically denies all claims without algorithm review, thereby necessitating a nurse and/or physician to personally review the request. (ECF No. 220 at ¶¶ 76-79.) Nedza also alleges that AIM had a secret "case aging" policy whereby AIM's physician reviewers would deny a pre-authorization request *without reviewing it* if a medical provider failed to respond to an inquiry from AIM within one business day. (*Id*. at ¶¶ 86-87.) These facts plausibly allege that AIM's process violated the requirement that MA plan insurers make coverage determinations based on individual medical necessity because the allegations show ways in which AIM's process denied claims based on general procedural rules rather than any type of individual review that considered a beneficiary's medical circumstances.

Further, Nedza plausibly alleges AIM's pre-authorization process violated the so-called Basic Benefit requirement, which requires MA plans to cover all services covered under Original Medicare. Pursuant to this requirement, MA plans must cover any service contained in NCDs or

LCDs. (*Id.* at ¶¶ 94-95); *see also* CMS Medicare Managed Care Manual, § 4.90.1. But Nedza alleges that AIM's official policy was to base its coverage decisions on its own internal guidelines, which were more restrictive than—and thus effectively violated—NCDs and LCDs. (ECF No. 220 at ¶ 101.) Nedza provides three specific examples of how AIM's internal coverage guidelines materially deviated from Medicare coverage rules. (*Id.* at ¶¶ 96-100.) Thus, Nedza shows how AIM's internal coverage guidelines led to MA plans covering less services than Original Medicare, thereby violating Medicare rules and regulations.

While the allegations above show how AIM's pre-authorization review process could violate the two "core" requirements, Nedza offers further facts which plausibly allege the process did violate these requirements. In particular, Nedza cites a 2013 internal review of 164 cases where AIM denied pre-authorization requests; the review found that 160 of those denied requests should have been approved under Medicare coverage rules. (*Id.* at ¶ 124.) Further, Nedza alleges that in 2014, AIM experimented with two alternative review processes—one version that fully complied with Medicare rules and another "hybrid" version that complied more fully than AIM's standard "rigged" process—and denial rates decreased to near 0 percent and about 1 percent, respectively. These facts, when viewed together, sufficiently allege that AIM's process violated Medicare rules.

### 3. Rule 9(b)

AIM also alleges that Nedza fails to plead her FCA claim with the particularly that Rule 9(b) demands. Again, Rule 9(b) requires that Nedza describe "the who, what, when, where, and how" of his FCA claim, "the first paragraph of any newspaper story." *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009). This heightened pleading standard recognizes "the stigmatic injury that potentially results from allegations of fraud" and, accordingly, is meant to encourage a plaintiff to conduct a "careful pretrial investigation." *Presser*, 836 F.3d at 776

(quoting *Fid. Nat'l Title Inc. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 749 (7th Cir. 2005)). But the Seventh Circuit has warned that "courts and litigants often erroneously take an overly rigid view of the formulation and that the precise details that must be included in a complaint may vary on the facts of a given case." *Id.* (quotations omitted).

AIM appears to argue that Nedza does not meet Rule 9(b) because she fails to point to any specific MA beneficiaries who were denied coverage in violation of Medicare rules and because she fails to point to the specific MA contract documents or false claims for payment. The Court thinks AIM demands too much. "To say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement)." *Lusby*, 570 F.3d at 855.

Regarding specific coverage denials, it is doubtful Nedza had access to these materials in her role at AIM. While Nedza alleges that her position as Chief Medical Officer allowed her to gain insight into AIM's policies and practices and witness the comments and conduct of AIM's executives, she was not involved with "the day-to-day review of pre-authorization requests." (*Id.* at ¶ 19.) "The particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail her claim." *Presser*, 836 F.3d at 778 (quoting *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998)). AIM contends that, given Nedza's representations of her involvement in developing and overseeing AIM's polices and procedures, "she cannot credibly assert she did not have access to information about AIM's clinical guidelines, their alignment with Medicare guidelines, or their application." (ECF No. 236 at 12-13.) While Nedza does not allege details of specific denials, she does provide a 100-foot view of how AIM's process violated Medicare rules. And in addition to providing specifics on the procedural gimmicks AIM allegedly used to deny pre-authorization requests, Nedza *does* give examples of how AIM's internal coverage guidelines materially deviated from Medicare rules (*See* ECF No.

220 at ¶¶ 100-101.) Such allegations satisfy Rule 9(b). Further, even given her apparent lack of access to specific pre-authorization requests, Nedza's allegations regarding AIM's internal 2013 review of denials and its 2014 experimentation with more compliant review processes allow for the reasonable inference that AIM's process *was* denying pre-authorization requests in violation of Medicare rules. "For now, [at the pleadings stage,] an inference is enough." *Leverski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 839 (7th Cir. 2013).

Likewise, Nedza's allegations regarding the MA contract documents containing the false statements satisfy Rule 9(b). In general, it is not "essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit." *Lusby*, 570 F.3d at 854 (rejecting argument that relator needed to include specific requests for payment and instead relying on sample certification forms); *see also Leveski*, 719 F.3d at 839 (noting that relator "need not produce copies of the [agreements] in which [defendant] certified compliance with the [Higher Education Act] at the outset of her lawsuit"). Like specific coverage denials, it does not appear Nedza had access to AIM's contract documents or billing materials, but nonetheless, the TAC sufficiently alleges the MA contract documents contained the certification provisions at issue and that the MA plans submitted monthly requests for capitation payments pursuant to the MA contracts.

In summation, Nedza leaves no doubt as to "the identity of the person making the misrepresentation [AIM through its MA plan clients],[8] the time [at least on an annual basis], place [in the MA contract documents], and content of the misrepresentation [the express certifications of compliance with Medicare rules and regulations], and the method by which the misrepresentation was communicated to the plaintiff [during her time employed at AIM]." *U.S. ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014); *see also*

---

[8] Nedza identifies the insurers who contracted with CMS to offer MA plan and used AIM's services. (ECF No. 220 at ¶ 27.)

*U.S. ex rel. Hanna v. City of Chi.*, 834 F.3d 775, 779-80 (7th Cir. 2016) (analyzing Rule 9(b) requirements).

Finally, regarding the requirement that Nedza plead AIM's intent to disregard Medicare rules at the time the MA plan contracts were finalized (as required to state a claim under a fraudulent inducement theory), Nedza again meets her pleading burden. Rule 9(b) allows a plaintiff to plead knowledge and intent generally. *See* Fed. R. Civ. P. 9(b); *see also Upton*, 2013 WL 791441, at *6. Nedza alleges AIM's knowledge that its review process violated Medicare rules and its intent to continue using its review process notwithstanding the MA contractual obligations to follow Medicare rules. Further, Nedza's specific allegations showing that AIM executives knew of these compliance issues for years and that CMS required annual renewal of MA plan contracts further supports Nedza's general allegations of knowledge and intent. This satisfies Rule 9(b). *See id.* at *4-6; *see also U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 725–26 (N.D. Ill. 2007) (finding the plaintiff sufficiently met the requirements of *Main* where plaintiff alleged that the defendants knew about contract's nondiscrimination provisions and statutes and told the agency that it would comply but planned to violate, and was already violating, those provisions).

### 4. Materiality

Finally, AIM argues that Nedza fails to meet the materiality standard outlined in *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2001-02 (2016). The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). *Escobar* held that to properly plead materiality, a plaintiff must show that the effect or likely behavior of the government—if it knew that the defendant had made false statements in seeking payment—would be to refuse

payment. *Id.* at 2002. "The materiality standard is demanding" because the FCA "is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2003.

AIM invokes materiality in arguing that Nedza fails to state a FCA claim under an implied certification theory. (*See* ECF No. 225 at 7-9; *see also* ECF No. 236 at 6-10.) *Escobar* dealt only with an implied certification theory, and as far as this Court can tell, neither the Supreme Court nor the Seventh Circuit has explicitly said that *Escobar*'s materiality requirement extends to all types of FCA claims. An implied certification theory is premised on the idea that a defendant's *omission* of certain statutory, regulatory, or contractual violations renders a representation in a claim for payment false. *Escobar*, 136 S. Ct. at 1996. Here, under a fraudulent inducement theory, Nedza's FCA claim is premised on an express *misrepresentation*, i.e., expressly agreeing to comply with Medicare rules and regulations when AIM does not. Some courts have found that this difference removes the requirement to plead materiality. *See e.g., McCarthy*, 2014 WL 4924445, at *4 (noting "materiality is not relevant in FCA claims in the context of misrepresentations" and finding it unnecessary for plaintiff to plead its false certification was material to government's decision to award contract).

However, even assuming Nedza must allege materiality, the Court finds she has done so. Nedza alleges that CMS would not have entered into the MA plan contracts at issue if the insurers and AIM did not certify compliance with Medicare rules and regulations. (ECF No. 220 at ¶¶ 164-165.) Nedza also alleges that CMS explicitly states that compliance with the MA program's two "core" requirements (i.e., the Basic Benefit requirement and individualized medical determinations requirements) is a material term of each MA contract. (*Id.* at ¶ 49); *see also* 42 C.F.R. § 422.504(a). Further, as alleged, the nature of the "core" requirements—as well as CMS' statements essentially

ensuring the public that MA plans will comply with these requirements (*see e.g.,* ECF No. 220 at ¶ 38)—allow for at least a reasonable inference that they are indeed material to CMS's decision to make capitated payments to MA plans.

## II. Anthem

The Court finds that Nedza fails to allege a FCA claim against Defendant Anthem. In support of dismissal, Anthem argues that Nedza fails to allege facts showing Anthem was directly involved in AIM's pre-authorization review process or to allege facts necessary to pierce the corporate veil and hold Anthem liable for AIM's conduct. (ECF No. 225 at 18-20.) Nedza concedes she has not alleged facts sufficient to pierce the corporate veil but argues she has alleged facts showing AIM's direct participation in the fraudulent conduct underlying her FCA claim. (ECF No. 232 at 25-26.) More specifically, Nedza points to communications between AIM executives and Anthem executives and alleges that Anthem knew AIM's "rigged" pre-authorization process violated Medicare rules and regulations but never ordered AIM to stop violating Medicare rules. (ECF No. 220 at ¶¶ 146-148.) Nedza also alleges Anthem directly participated in the fraudulent activity by directing its MA plan insurers to use AIM's services. (*Id.* at ¶¶ 27, 149-155.)

Parent companies "are not generally liable for the misdeeds of their subsidiaries…and the FCA does not alter that general rule." *U.S. ex rel. Lisitza v. Par Pharm. Companies, Inc.*, No. 06 C 6131, 2013 WL 870623, at *5 (N.D. Ill. Mar. 7, 2013) (citing *United States v. Bestfoods*, 524 U.S. 118 S. Ct. 1876 (1998)). Instead, to state a claim against Anthem, Nedza must show direct participation by Anthem "to support a claim against the parent for the subsidiary's FCA violation." *Id.* (quoting *U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 60 (D.D.C. 2007); *see also U.S. ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 50 (D.D.C. 2014) ("Courts generally require that the defendant affirmatively act in order to impose liability

under the FCA, particularly when a plaintiff alleges that the defendant 'caused' the submission of false claims.").

Nedza pleads facts showing Anthem had knowledge of AIM's conduct, and despite this knowledge, Anthem never ordered AIM to stop using its pre-authorization process or to modify it to comply with Medicare rules. But as the cases above suggest, Anthem's knowledge and inaction—standing alone—cannot form the basis of FCA liability. Nedza does allege Anthem actively directed its subsidiary insurers operating MA plans to use AIM, but Nedza fails to allege sufficient facts in support of this theory. Nedza includes only conclusory allegations that Anthem "directed" its subsidiary insurers to use AIM during certain time periods. Standing on their own, these "facts" are not sufficient. *Lisitza*, 2013 WL 870623, at *5 (finding conclusory allegations that parent company "controlled" or "directed" subsidiary's fraudulent marketing practices failed to support a FCA claim against parent company). For the same reason, Nedza's sole allegation that Anthem was "intimately involved in the design and direct approval of AIM's rigged review process" does not, on its own, plausibly allege Anthem's direct participation.

## CONCLUSION

Based on the foregoing, the Court denies the Defendants' Motion to Dismiss [224] as to Defendant American Imaging Management, Inc., and grants the motion as to Defendant Anthem Inc. The claims against Anthem, Inc. are dismissed without prejudice. If Nedza desires to file an amended complaint and can do so consistently with this Memorandum Opinion and Order and the Federal Rules of Civil Procedure, she may do so within 21 days.

**SO ORDERED.**                                      **ENTERED: March 26, 2020**

_____
**HON. JORGE ALONSO**
**United States District Judge**

.