UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, ex rel. DR. SUSAN NEDZA,<br><br>Relator,<br><br>v.<br><br>AMERICAN IMAGING MANAGEMENT, INC.,<br><br>Defendant. | ) | Case No. 15-cv-6937<br><br>Judge Alonso<br>Magistrate Judge Cox |

**RELATOR'S RESPONSE TO DEFENDANT AIM'S MOTION**
**FOR PROTECTIVE ORDER LIMITING THIRD PARTY SUBPOENAS**

Defendant AIM has moved for a protective order to limit the scope of Rule 45 third-party subpoenas based on three flawed premises. ECF No. 285 ("Motion"). First, Defendant claims this dispute over dates is controlled by an October 2020 Order, ECF No. 265, when in fact nothing about third-party discovery was presented or ruled on last fall. Second, Defendant claims "nothing has changed" since the October 2020, Mot. at 2, when in fact discovery has turned up new facts that reveal the importance of disputed evidence. Third and most importantly, Defendant argues this evidence "is not relevant," Mot. at 5, when in fact the two discrete disputes here are about evidence critical to key issues including the scope, impact, and materiality of the fraud. Defendant's motion to protect *third parties* from discovery seeks to conceal critical evidence.[1] The motion should be denied.

[1] No objection by the third-party subpoena respondents is at issue in this motion.

## I. BACKGROUND

Relator Dr. Susan Nedza alleges that AIM designed and operated an intentionally fraudulent system of pre-authorization review of imaging services (e.g., MRI scans) for health insurance plans that provide Medicare Advantage insurance for the government (herein "the AIM review process"). Dr. Nedza is the former Chief Medical Officer of Defendant AIM. As Relator, Dr. Nedza disclosed that, for years, the AIM review process ignored mandatory Medicare coverage requirements and flouted Medicare rules designed to ensure a fair, individualized decision-making process for whether a Medicare beneficiary would receive healthcare. Discovery thus focuses on how the AIM review process operated, how AIM practices and procedures violated the requirements of the Medicare Advantage program, and the facts that AIM knew and lied about violating Medicare rules. The Parties also dispute the issue of materiality under the False Claims Act, that is, whether the government or health insurance plans (which operate the Medicare Advantage plans for the government) would conclude that AIM *materially* deviated from the Medicare Advantage program requirements. Further, the Parties dispute whether and when AIM's fraudulent practices changed (or stopped), and financial outcomes of AIM's fraud as related to both materiality and damages.

Since the summer of 2020, the Parties have cooperated productively on written discovery and document production in this document intensive and highly complex case. Through month after month of meet and confer sessions, Relator and AIM established an ESI protocol for discovery (November 2020), exchanged and met repeatedly on responses to written discovery by both Parties, and negotiated custodians (December 2020) and search terms for AIM's ESI search (the most recent of which AIM proposed just this week). The Parties have been busy and Relator has patiently and persistently followed up with AIM to

secure responses to basic requests for production through weekly or bi-weekly rolling productions from AIM that include nearly 23,000 documents in just the last three weeks. Though the Parties have collaborated on discovery to largely avoid motion practice so far, Relator is still working with AIM to secure responses to May 2020 and April 2021 discovery requests. A number of important topics remain to be addressed.

In March 2021, the Parties jointly sought a fact discovery extension through March 2022. ECF No. 274. The motion was granted in part with an extension to December 20, 2021 for now. ECF No. 275. In June 2020, both Relator and Defendant served document subpoenas on health insurance plans that were Medicare Advantage clients of AIM. Relator is engaged in productive conversations with these insurance plans regarding the subpoena responses, and no subpoenaed party has objected as to the temporal scope or suggested that the disputes here meaningfully effect the burden of response.

## II. ARGUMENT

Defendant AIM ignores the nature and history of this case as well as key facts uncovered in discovery. AIM requests a protective order that would conceal evidence under the guise of protecting third parties from the burden of discovery. The specific discovery at issue is discrete, likely to be highly relevant evidence to key issues, and involves little burden. "As the part[y] seeking a protective order, defendant[] bear[s] the burden of demonstrating [good cause] why the order should be entered." *ED&F Cap. Markets Ltd. v. JVMC Holdings Corp.*, 335 F.R.D. 174, 177 (N.D. Ill. 2020). AIM fails to carry that burden and its flawed motion should be denied.

First, the flawed primary basis of AIM's motion is the assertion that the subpoenas are barred by the Magistrate Judge's October 2020 order. The Order stated that broad first-party

discovery would *start* with documents from the time period January 1, 2007 through August 17, 2015. ECF No. 265. The Court was not presented with and thus did not rule on the current date disputes or any issue about third party discovery. *See United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) ("courts normally decide only questions presented by the parties"); *see also Am. Chems. & Equip., Inc. 401(k) Retirement Plan v. Principal Mgmt. Corp.*, 414-CV-44, 2015 WL12834384, *2-4 (S.D. Iowa May 15, 2015) (denying a protective order to limit temporal scope of third-party discovery where existing discovery agreement only applied to discovery between parties). The basis of the Court's prior ruling was to balance "relevance and burden" for the discovery then at issue. ECF No. 265. The Order also recognizes that the date range is open to change. *Id.* ("The Court may consider arguments to extend the scope at a later date.").

Nothing in the Federal Rules or the authority cited by AIM states that first-party discovery and third-party discovery *per se* follow the same parameters. Rule 45 subpoenas to third parties are often narrower or different in substance than party discovery, and thus the temporal scope may well be different and tailored to the requests. The subpoenas here, for example, are targeted to basic Medicare Advantage bid and contract documents, claims data, and documents and communications related to AIM's Medicare Advantage compliance. See Mot., Ex. A at 7-8 (subpoena rider). The authority in AIM's motion simply states the uncontroversial proposition that relevance and proportionality are considerations for a motion under Rule 26. And of course, AIM has little basis to complain about purported burden arising from discovery of documents from distinct third-party entities.

Regardless, the dispute here is over a four-month period (August 17, 2015 through December 31, 2015) and a single request for production (#16). The production of the requested documents is a relatively simple matter that places little, if any, burden on the third-party

respondents, and certainly far less than the burden if Relator is forced to seek to serve a second subpoena on all fourteen insurance plans.

Second, AIM argues incorrectly that "nothing has changed" since the date issue was last disputed in October 2020. Mot. at 2. Nothing could be further from the truth. In fact, discovery has revealed significant changes to the practices involved in the AIM fraud throughout 2015. Though AIM used many fraudulent practices, one major component of this case is the AIM utilization management ("UM") review process that *ignored* the Medicare coverage requirements. At the pleading stage, Relator alleged (based only on what she knew at the time she left AIM) that AIM was starting to discuss changing this UM review process at the end of 2014. Discovery has since revealed that all throughout 2015 AIM did develop, implement, evaluate, and modify a new "hierarchical" review process that *used* Medicare coverage rules. AIM told its insurance plan clients that this hierarchical review model was the lawful "compliant" review process and that the prior AIM UM process was not.

But this major change in the AIM fraud did not happen overnight. Discovery has revealed that not all AIM's Medicare Advantage clients had switched to the new purportedly Medicare compliant hierarchical review model by August 17, 2015, and certain aspects of this change were not even scheduled to occur until December 2015. AIM also continued to evaluate and modify the hierarchical review model during 2015 even after implementation began. For example, a document produced at the end of last week shows that on July 24, 2015, AIM again changed how it used Medicare rules under the hierarchical model for certain imaging scans, with the changes apparently intended to deny more medical care. AIM-00759669. New evidence produced since October 2020 fully supports the date ranges of Relator's requests, which remain tailored to the scope of the fraud as it is being uncovered.

Third, the disputed evidence is relevant and essential to Relator's case. It appears that the hierarchical review model was not fully in place for all of AIM's clients until 2016. And so evidence from August to December 2015, during that transition, will disclosure whether, how, and when AIM's review model changed to the "complaint" (as AIM executives describe it) hierarchical review model.

It will reveal evidence about how AIM's insurer clients reacted and responded to this change that AIM initiated "for compliance" reasons and to the fallout as financial savings AIM generated for the insurance plans apparently plummeted under the "compliant" system, triggering negotiations about modifications to some of AIM's contracts with these clients.

It will reveal evidence about how the change from the AIM UM review process to a "compliant" review process affected the operation of the insurers' Medicare Advantage plans and their contracts with CMS. Evidence from the end of 2015 would capture the insurance plans' agreements with CMS and documents about how the insurance plans would operate in 2016 (the first full year that the hierarchical review was fully in place for all of AIM's clients). AIM contends that the fraud would not impact the contracting or payments between CMS and its Medicare Advantage clients, and so evidence about how AIM's "compliance" change in 2015 affected the Medicare Advantage plan operations and relationship with CMS is certainly relevant to AIM's arguments.

Further, one of the disputes here is how to measure the impact of AIM's fraud. Evidence about the outcomes from the hierarchical review process that AIM called "compliant," compared to the outcomes of the prior UM review process, may well provide evidence to measure effects of AIM's fraudulent practices. It may reveal which individual patients were cheated out of medical care by AIM's UM process that could have received care under the so-

called "compliant" hierarchical review process. This comparison is not available from evidence pre-2015, and the comparison should not be limited to a few weeks of data for a health plan that implemented the hierarchical review in August 2015. The reasonable, bounded time period for appropriate discovery thus goes beyond the first date of implementation of the hierarchical review and requires evidence about the outcomes of hierarchical review through the end of 2015.

Defendant also quietly seeks to strike Relator's single request for documents (#16) about how the government and how the insurance plans (operating a Medicare Advantage program for the government) responded to learning of Relator's allegations of fraud when this case was unsealed in 2017. Mot. at 4 (seeking to bar Request 16 for communications about what the Plans did upon learning of the allegations in the complaint). Defendant argues that the fraud here was not material—that is the insurers and government would not have acted differently had they known of the fraud. Materiality goes to whether the decision to pay AIM or the MA Plans "would likely or actually have been different" had the noncompliance been known. *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016). Evidence about how the Plans reacted to learning of the fraud in 2017 is clearly relevant to this issue. Did the plans complain to AIM? Did they require AIM to change its processes or contracts? Did they seek refunds or other remedies? Did they self-report to CMS? This evidence is only available after 2017 and not logically bounded by a discovery period of 2007 to 2015.

Notably, nowhere in the Motion does AIM present any argument as to how the evidence sought by Request 16 is *not* relevant. Instead, AIM seeks to bar any discovery of what happened after Dr. Nedza blew the whistle on this fraud. AIM wants to defend this case by offering only its own evidence on these topics from 2015 on without scrutiny, discovery, or the

possibility of rebuttal. The Federal Rules do not countenance such one-sided access to evidence. *H Guys, LLC v. Halal Guys Franchise, Inc.*, No. 19 C 4974, 2020 WL 3578026, at *5 (N.D. Ill. July 1, 2020) ("One-sided presentations that are insulated from scrupulous examination are inconsistent with the ascertainment of truth, which after all, is the object of all discovery and all trials.").

Finally, the discrete disputed discovery does not threaten the litigation schedule. The insurance plans have not yet responded to these Rule 45 subpoenas and so it will be most efficient to pull claims and other data once for the appropriate time period (through the end of 2015). Nor are the Parties on the cusp of completing fact discovery, despite their diligent ongoing efforts. AIM is still working to find and produce documents responsive to May 2020 discovery requests and Relator anticipates—regardless of this motion—additional discovery motions, third-party subpoenas, and oral discovery that even with diligence may well run into 2022 as the Parties jointly anticipated last March.

**CONCLUSION**

The discovery disputed here is discrete and critically relevant. It would be difficult to reach a fair resolution of this case without the essential evidence from the end of 2015 and evidence about how the Plans and government responded to notice of this fraud in 2017. The motion should be denied.

Dated: August 4, 2021

Respectfully submitted,

/s/ *Charles Wysong*

Matthew J. Piers, mpiers@hsplegal.com
Charles Wysong, cwysong@hsplegal.com
Emily Rees Brown, ebrown@hsplegal.com
Tex Pasley, tpasley@hsplegal.com
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
70 W. Madison Street, Suite 4000

Chicago, IL 60602
312.580.0100

Steven Cohen, scohen@cohenlawgroup.com
COHEN LAW GROUP
70 West Madison Street, Suite 4000
Chicago IL 60602
312.327.8800

Erika Kelton,
ekelton@phillipsandcohen.com
Peter Budetti,
pbudetti@phillipsandcohen.com
Samuel Brown,
sbrown@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave. NW Washington, DC 20036
202.833.4567

*Counsel for Relator*

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 4, 2021, a copy of the foregoing **RELATOR'S RESPONSE TO DEFENDANT AIM'S MOTION FOR PROTECTIVE ORDER LIMITING THIRD PARTY SUBPOENAS** was served electronically to all persons identified on the Service List below.

Lisa Noller, lnoller@foley.com
Patrick McMahon, pmcmahon@foley.com
Mason D. Roberts, mroberts@foley.com
FOLEY & LARDNER, LLP
321 North Clark Street, Suite 3000
Chicago, IL 60654
312.832.4500

Michael J. Tuteur, mtuteur@foley.com
Jessica E. Joseph, jjoseph@foley.com
FOLEY & LARDNER, LLP
111 Huntington Avenue, Suite 2600
Boston, MA 02199
617.342.4000

Lucie Cohen, lucie.cohen@nelsonmullins.com
Nelson, Mullins, Riley & Scarborough LLP
Meridian, 17th Floor
1320 Main St
Columbia, SC 29201
803.255.9332

Robert L. Lindholm, robert.lindholm@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Wells Fargo Center, 23rd Floor
301 College Street
Charlotte, NC 28202
704.417.3231

_/s/ *Charles Wysong*________
cwysong@hsplegal.com